[Cite as *State v. Patterson*, 2012-Ohio-2839.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,                CASE NO. 5-11-15

      v.

CORNELIUS PATTERSON, JR.,           O P I N I O N

      DEFENDANT-APPELLANT.

Appeal from Hancock County Common Pleas Court
Trial Court No. 2009-CR-218

**Judgment Affirmed**

**Date of Decision: June 25, 2012**

APPEARANCES:

    *Deborah Kovac Rump* for Appellant

    *Mark C. Miller and Drew A. Wortman* for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Cornelius Patterson, Jr. ("Patterson"), appeals the Hancock County Court of Common Pleas' judgment of conviction and sentence. For the reasons that follow, we affirm.

{¶2} During the early hours of October 18, 2009, Patterson's live-in girlfriend, Stacey Daniels, had an argument with David Snyder, the live-in ex-boyfriend of her friend, Samantha Garberson, in the apartment Snyder and Garberson shared, which was located directly above the apartment Daniels shared with Patterson. (Feb. 8-15, 2011 Tr. 447-456, 469-470, 706-708). Daniels left the apartment and returned to her apartment where she had a physical confrontation with Patterson outside the apartment. (*Id*. at 470-472, 706-708). Upon hearing the commotion, Snyder exited his apartment, and Patterson chased Snyder back into his apartment with a handgun. (*Id*. at 473-478, 510, 526, 634-635). Snyder entered his apartment and locked the door. (*Id*. at 634-635). Patterson kicked Snyder's door in; Snyder struggled to hold the door closed; and, Patterson fired a shot through the door killing Snyder. (*Id*. at 410, 478, 857-858, 634-638, 990-991). While Patterson and Daniels fled to Toledo, Patterson discarded the firearm alongside the road. (*Id*. at 481, 712-714, 755, 991).

{¶3} On October 27, 2009, the Hancock County Grand Jury indicted Patterson on Count One of aggravated felony murder in violation of R.C.

2903.01(B), an unclassified felony; Count Two of aggravated burglary in violation of R.C. 2911.11(A)(2), a first degree felony; Count Three of improperly discharging of a firearm into an occupied structure in violation of R.C. 2923.161(A)(1), a second degree felony; and Count Four of tampering with evidence in violation of R.C. 2921.12(A)(1), a third degree felony. (Doc. No. 1). All four counts included a firearm specification pursuant to R.C. 2941.145. (*Id.*).

{¶4} On November 12, 2009, Patterson appeared for arraignment and entered pleas of not guilty. (Doc. No. 9); (Nov. 12, 2009 Tr. at 4). The trial court set bond at $1 million, without a 10% bond provision. (Doc. No. 9).

{¶5} On November 13, 2009, Patterson filed a motion asking the trial court to reduce his bond or, alternatively, allow him to post a property bond, surety, or permit the 10% bond provisions under Crim.R. 46. (Doc. No. 14). On December 7, 2009, the trial court denied the motion. (Doc. No. 21). On December 21, 2009, Patterson filed a second motion for bond reduction and/or modification, which was denied on February 23, 2010. (Doc. Nos. 25, 38).

{¶6} On January 7, 2010, Patterson filed a motion for change of venue due to allegedly prejudicial pretrial publicity. (Doc. No. 31). On January 21, 2010, the trial court held a hearing on this motion and others Patterson previously filed. (Doc. No. 36). However, the trial court deferred ruling on Patterson's change of venue motion until trial. (*Id.*).

{¶7} On September 20, 2010, Patterson filed a third motion for bond reduction and/or modification. (Doc. No. 113). On September 27, 2010, the trial court held a hearing on the motion and took the matter under advisement. (Doc. No. 115). On October 22, 2010, the trial court denied the motion. (Doc. No. 117).

{¶8} The matter proceeded to jury trial on February 8, 2011. On February 15, 2011, the jury found Patterson guilty on all four counts, along with the attendant gun specifications. (Doc. Nos. 158-161).

{¶9} On April 11, 2011, Patterson filed a sentencing memorandum arguing that Counts One, Two, and Three were allied offenses. (Doc. No. 171).

{¶10} On April 21, 2011, a sentencing hearing was held. (Doc. No. 172). The trial court determined that Counts One, Two, and Three were allied offenses under R.C. 2941.25(A) and *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, but Count Four, tampering with evidence, was not an allied offense. (*Id.*). The State elected to sentence Patterson on aggravated felony murder, and the trial court sentenced Patterson to life, with parole eligibility after 30 years. (*Id.*). The trial court sentenced Patterson to a three-year mandatory term on the firearm specification contained within Count One, and the trial court sentenced Patterson to four years on Count Four, tampering with evidence. (*Id.*). The trial court further ordered that the terms imposed be served consecutively for an aggregate sentence of life imprisonment with parole eligibility after 37 years. (*Id.*).

{¶11} On May 3, 2011, Patterson filed a notice of appeal. (Doc. No. 179). Patterson now appeals raising nine assignments of error. We elect to combine some of Patterson's assignments of error for discussion and to address some of Patterson's assignments of error out of the order raised in his brief.

### ASSIGNMENT OF ERROR NO. VIII

**PATTERSON'S RIGHTS TO ASSIST IN HIS DEFENSE, ENJOY EFFECTIVE ASSISTANCE OF COUNSEL, A PRESUMPTION OF INNOCENCE AND DUE PROCESS WERE VIOLATED BY THE EXCESSIVE BOND IMPOSED UPON HIM BY THE TRIAL COURT.**

{¶12} In his eighth assignment of error, Patterson argues that the trial court's excessive bail violated his right to effective assistance of counsel under the 6th Amendment, his due process rights under the Fourteenth Amendment, and his protection against excessive bail under the Eighth Amendment and Sec. 9, Article I of the Ohio Constitution.

{¶13} The Eighth Amendment to the U.S. Constitution and Section 9, Article I of the Ohio Constitution both forbid "excessive bail." Crim.R. 46(C) provides:

In determining the types, amounts, and conditions of bail, the court shall consider all relevant information, including but not limited to:

(1) The nature and circumstances of the crime charged, and specifically whether the defendant used or had access to a weapon;

(2)   The weight of the evidence against the defendant;

(3)   The confirmation of the defendant's identity;

(4)   The defendant's family ties, employment, financial resources, character, mental condition, length of residence in the community, jurisdiction of residence, record of convictions, record of appearance at court proceedings or of flight to avoid prosecution;

(5)   Whether the defendant is on probation, a community control sanction, parole, post-release control, bail, or under a court protection order.

{¶14} "A trial court has broad discretion to set bail in an amount necessary to ensure that the accused will appear at all subsequent stages of the proceedings." *State v. Vaughn*, 106 Ohio App.3d 775, 787 (12th Dist.1995), citing *Bland v. Holden*, 21 Ohio St.2d 238, 239 (1970).  Consequently, an appellate court reviews the trial court's decision concerning the amount of bail under an abuse of discretion standard.  *State v. Thomas*, 8th Dist. No. 89583, 2007-Ohio-1692, ¶ 8. An abuse of discretion is more than an error of judgment; rather, it connotes that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶15} The trial court did not abuse its discretion by setting Patterson's bond at $1,000,000 with no 10% provision in this case.  Patterson was charged with

aggravated felony murder, aggravated burglary, improper discharge of a firearm, and tampering with evidence; Patterson used a firearm during the commission of the offenses; several witnesses identified Patterson as the shooter; Patterson fled the jurisdiction immediately following the commission of the crime, taking his girlfriend and her minor children with him; Patterson has family out of the jurisdiction; and Patterson had other traffic and misdemeanor convictions on his record. Given the serious nature of the crimes Patterson was charged with, and his flight from the jurisdiction after committing the crime, we cannot conclude that the trial court abused its discretion in this case. See *Ahmad v. Plummer*, 126 Ohio St.3d 262, 2010-Ohio-3757 ($3 million bail not excessive for defendant accused of conspiracy to commit murder); *Nawash v. McFaul*, 8th Dist. No. 81380, 2002-Ohio-3645 ($1 million bail not excessive for defendant accused of conspiracy to commit aggravated murder, attempted aggravated arson, and attempted aggravated robbery).

{¶16} Patterson also alleges that his excessive bail denied him effective assistance of counsel and a presumption of innocence. We disagree. To begin with, Patterson fails to offer any support for his bald assertions. Aside from that, the record indicates that Patterson was afforded extra accommodations to meet with defense counsel while in jail. (Nov. 4, 2010 Tr. at 11-13). The record is

absent any indication that Patterson forfeited his presumption of innocence during this case.

{¶17} Patterson's eighth assignment of error is, therefore, overruled.

**ASSIGNMENT OF ERROR NO. IV**

**PATTERSON'S ATTORNEYS PROVIDED INEFFECTIVE ASSISTANCE BY NOT TIMELY RAISING THE CHANGE OF VENUE ISSUE PRIOR TO THE JURY BEING EMPANELED, OR THE TRIAL COURT ABUSED ITS DISCRETION BY UNTIMELY DENYING THE MOTION.**

{¶18} In his fourth assignment of error, Patterson argues that trial counsel was ineffective for failing to raise the issue of pretrial publicity prior to empaneling the jury. Patterson further argues that the trial court erred by untimely denying his motion for a change of venue until after the trial was already underway.

{¶19} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) the counsel's performance was deficient or unreasonable under the circumstances; and (2) the deficient performance prejudiced the defendant. *State v. Kole*, 92 Ohio St.3d 303, 306 (2001), citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984).

{¶20} A trial court's ruling on a motion for a change of venue pursuant to Crim.R. 18(B) will not be disturbed on appeal absent an abuse of discretion. *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 116, citing *State v. Lundgren*,

73 Ohio St.3d 474, 479 (1995); *State v. Landrum*, 53 Ohio St.3d 107, 116 (1990). "[A] careful and searching voir dire examination provides the best test of whether prejudicial pretrial publicity prevents the seating of a fair and impartial jury from the community." *Roberts* at ¶ 116, citing *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, ¶ 35; *Landrum*, 53 Ohio St.3d at 117; *State v. Swiger*, 5 Ohio St.2d 151 (1966), paragraph one of the syllabus.

{¶21} A defendant claiming that he was denied a fair trial because of pretrial publicity must show that one or more jurors were actually biased. *Roberts* at ¶ 117, citing *State v. Treesh*, 90 Ohio St.3d 460, 464 (2001); *Mayola v. Alabama*, 623 F.2d 992, 996 (5th Cir.1980). Even pervasive, adverse publicity does not inevitably lead to an unfair trial, and only in rare cases may prejudice be presumed. *Roberts* at ¶ 117, citing *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791 (1976); *Treesh*, 90 Ohio St.3d at 464.

{¶22} On January 21, 2010, the trial court held a hearing on the motion but determined that the issue should be deferred until the potential jurors answered questions concerning pretrial publicity during voir dire. (Doc. No. 36); (Jan. 21, 2010 Tr. at 23-27). Prior to trial, the parties and the trial court agreed that the potential jurors would answer a special two-part questionnaire concerning pretrial publicity. (Feb. 8, 2011 Tr. at 6, 31, 229-230). Question one asked, "Have you read or heard any media accounts of the case pending against Cornelius Patterson,

Jr.?" (*Id.* at 230). The trial court permitted defense counsel to ask the potential jurors who answered "yes" to this question what was the source of their information in front of other potential members of the jury. (*Id.* at 227-237). With respect to jurors who indicated that the information they read or heard might impact their ability to render a fair and impartial verdict (question two), the trial court permitted the parties to question these potential jurors individually in chambers, and the trial court dismissed at least one potential juror on this basis. (*Id.* at 290-295). Prior to beginning the second day of trial, the trial court overruled Patterson's motion to change venue, stating the following:

> So the record is clear, the Court is overruling the Defendant's motion for change of venue, I think that's been the understanding of counsel for the Defendant, counsel for the State, obviously we seated a jury, and we are now into the trial. Just so the Record is complete, that has been kind of hanging in the sense [sic] and the Court should have put that on the Record after the jury was sworn, but it's now on the Record and that takes care of things. (*Id.* at 535-536).

{¶23} Patterson's ineffective assistance of trial counsel argument lacks merit. Trial counsel's performance on the pretrial publicity issue was not deficient or unreasonable. Contrary to Patterson's coloring of the record, trial counsel *did* address the issue of pretrial publicity through voir dire. The Ohio Supreme Court

-10-

has expressed that the "best test" for determining whether prejudicial pretrial publicity prevents the seating of a fair and impartial jury is a careful and searching voir dire. *Roberts*, 2006-Ohio-3665, at ¶ 116, citing *Lynch*, 2003-Ohio-2284, at ¶ 35; *Landrum*, 53 Ohio St.3d at 117; *Swiger*, 5 Ohio St.2d 151, paragraph one of the syllabus. Here, defense counsel questioned potential jurors who had indicated that they read or heard about the case prior to trial and even had one juror excused for that reason. Patterson has also failed to demonstrate that he suffered prejudice as a result of trial counsel's allegedly deficient performance. Additionally, the trial court did not abuse its discretion by denying Patterson's motion to change venue since it was able to seat a fair and impartial jury following voir dire on this issue.

**{¶24}** Patterson's fourth assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. VII

**PATTERSON'S RIGHTS TO DUE PROCESS OF LAW, AN IMPARTIAL JURY, AND A FAIR TRIAL PURSUANT TO THE 6TH AND 14TH AMENDMENTS WERE VIOLATED BECAUSE HE WAS SEEN MULTIPLE TIMES BY THE JURY POOL IN SHACKLES AND HANDCUFFS AND BEING TRANSPORTED IN THE COMPANY OF DEPUTY SHERIFFS.**

**{¶25}** In his seventh assignment of error, Patterson argues that he was denied the right to a fair trial since members of the jury saw him shackled and escorted by law enforcement during the voir dire.

{¶26} Although no one should be tried while shackled absent unusual circumstances, the danger of prejudice is slight where a juror's view of the defendant in custody is brief, inadvertent, and outside of the courtroom. *State v. Kidder*, 32 Ohio St.3d 279, 285-286 (1987) (citations omitted). Where the observation is brief and the general corrective instruction is given thereafter, any error which may have resulted from the failure to conduct a voir dire of the juror is harmless. *Id*.

{¶27} Patterson's argument lacks merit. At most, the record indicates that a potential juror, who was not ultimately selected as a juror or alternate juror, briefly witnessed Patterson handcuffed while Deputy Sheets and Deputy McCartney brought Patterson to the courthouse for trial. (Feb. 8, 2011 Tr. at 22-23). Deputy Sheets indicated that, before bringing Patterson into the courthouse, he scanned the hallway, and no one was in the hallway at that time. (*Id*. at 23). Deputy Sheets further indicated that his back was facing the door, along with Deputy McCartney, "Mr. Patterson stepped inside the hallway, handcuffs were taken off, and as I turned around I saw a female standing in the hallway at the time. That was it, Your Honor." (*Id*. at 24). Deputy Sheets identified the female as Deputy McCartney's wife, who happened to also be drawn as a potential juror in the case. (*Id*.). Patterson informed the trial court that he recalled also seeing a line of potential jurors gathering in front of the jury room. (*Id*. at 25-26). Deputy Sheets

indicated that he only recalled seeing Deputy McCartney's wife, and if there was a line of people it was down the hallway, and he could not say for sure they were potential jurors or whether they were there for other court hearings. (*Id*. at 26). Deputy Sheets stated that he took the handcuffs off Patterson immediately after Patterson stepped inside the door to the hallway, and the hallway was about 12-15 feet long. (*Id*. at 26-27). Deputy McCartney's wife, however, was not ultimately selected as a juror or an alternate juror. (*Id*. at 343-344).

{¶28} The record further indicates that members of the prospective jury were not biased from witnessing Patterson accompanied by sheriff's deputies. Defense counsel questioned several prospective jurors about this issue during voir dire, and the prospective jurors indicated that they "didn't think anything" about seeing Patterson with sheriff's deputies, or that they thought he was using the restroom, on one occasion, and going to lunch on another. (*Id*. at 256-258). When Patterson raised this issue to the trial court again, the following dialogue transpired:

> THE COURT: We visited that issue a couple of times already today. I think the Record is complete. You are in the custody of the sheriff. You are obviously in a three-piece suit, leg irons are covered by your trousers. You have not been cuffed in the courthouse as far as I know after your arrival this morning; is that correct?

Case No. 5-11-15

THE DEPUTY: Just in the hallway when we took the handcuffs off, that's it.

THE COURT: I assume that tomorrow will be the same and we will proceed accordingly. (*Id*. at 340-341).

{¶29} Finally, the trial court instructed the jury that the defendant is presumed innocent until proven guilty, and that the "evidence" for purposes of rendering their verdict was limited to the testimony, the admitted exhibits, facts agreed to by counsel, and facts the court requires them to accept as true. (*Id*. at 347, 348-349, 1210-1211). In light of the record herein, we conclude that any prejudice Patterson suffered was harmless beyond a reasonable doubt and not grounds for a new trial.

{¶30} Patterson's seventh assignment of error is, therefore, overruled.

**ASSIGNMENT OF ERROR NO. I**

**THE EVIDENCE IS INSUFFICIENT TO PROVE AGGRAVATED BURGLARY BECAUSE PATTERSON DID NOT TRESPASS INTO THE VICTIM'S APARTMENT. AND THE STATE FAILED TO PROVE PATTERSON ACTED "PURPOSELY." ACCORDINGLY, HIS CONVICTION FOR AGGRAVATED MURDER MUST THEN ALSO FAIL.**

**ASSIGNMENT OF ERROR NO. III**

**THE CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

-14-

**ASSIGNMENT OF ERROR NO. V**

**THE TRIAL COURT ERRED BY NOT GRANTING PATTERSON'S MOTION TO DISMISS THE TAMPERING OF EVIDENCE CONVICTION FOR LACK OF VENUE.**

**{¶31}** In his first assignment of error, Patterson argues that the State failed to produce sufficient evidence that he trespassed into the victim's apartment for purposes of his burglary conviction. Patterson further argues that the State failed to produce sufficient evidence to support his aggravated felony murder conviction since his burglary conviction was an element of that offense. Finally, Patterson argues that the State failed to produce sufficient evidence that he acted purposefully to support his aggravated felony murder conviction.

**{¶32}** In his third assignment of error, Patterson argues that his aggravated felony murder conviction was against the manifest weight of the evidence since the record lacked evidence that he intended to shoot the victim.

**{¶33}** In his fifth assignment of error, Patterson argues that the trial court erred by denying his Crim.R. 29(A) motion to dismiss the tampering with evidence charge since the State failed to produce sufficient evidence of proper venue.

**{¶34}** When reviewing the sufficiency of the evidence or the denial of a Crim.R. 29(A) motion, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus; *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997). On the other hand, when determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶35} Patterson was convicted under R.C. 2911.11(A)(2), which provides, in relevant part:

> [n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if * * *[t]he offender has a

deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.

Patterson was also convicted under R.C. 2903.01(B), which provides, in relevant part: "[n]o person shall purposely cause the death of another * * * while committing or attempting to commit * * * aggravated burglary * * *." Finally, Patterson was convicted under R.C. 2921.12(A)(1), which provides, in relevant part:

[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any * * * thing, with purpose to impair its value or availability as evidence in such proceeding or investigation * * *.

{¶36} The State of Ohio called 20 witnesses at trial. We will summarize the substance of their testimony herein. Aaron Flechtner ("Flechtner"), a patrolman with the Findlay Police Department, testified that, around 4:30 a.m. on October 17, 2009, he responded to a shooting at 2200 Jennifer Lane Apartment 8 in Findlay, Ohio. (Feb. 8-15, 2011 Tr. at 398-400). Flechtner testified that, as he approached the eastside door of the apartment complex, an unknown male pointed upstairs to Apartment 8, where Flechtner could hear a female yelling that someone had been shot. (*Id*. at 407). Flechtner testified "the door to Apartment 8 was

-17-

open, you could see that the door had some damage to the frame, there was splintering, there were wood shavings and chips on the floor." (*Id*. at 408). Inside the apartment Flechtner saw a white female, later identified as Samantha Garberson, trying to pull up a white male, later identified as David Snyder, by the arm while she was talking on the phone. (*Id*.). Flechtner testified that he located a possible gunshot wound on Snyder's right side just under his armpit. (*Id*.). Flechtner testified that Snyder had a pulse, was moving his head around, and was attempting to speak, though Flechtner could not understand him. (*Id*. at 409). Flechtner testified that Garberson gave him a towel to stop the bleeding, and he called for medical assistance. (*Id*.). Flechtner testified that, while they were waiting for medical assistance, Snyder began moving less, and Snyder did not have a pulse, so he began chest compressions. (*Id*. at 410). The ambulance arrived and transported Snyder to Blanchard Valley Hospital where he was pronounced dead upon arrival. (*Id*. at 410, 423).

{¶37} Garberson was walking all over the apartment talking on her phone hysterically, according to Flechtner. (*Id*.). Flechtner identified State's exhibit 2 as a diagram of the apartment, and he testified that he recalled observing a baseball bat in the apartment. (*Id*. at 411-412, 427-428). He testified that the apartment door opened into the apartment. (*Id*. at 412). Flechtner identified State's exhibit 3 as a photograph of the entrance to Apartment 8, viewing the living room area. (*Id*.

at 413).  Flechtner testified that the baseball bat, blood-soaked towel, and damage to the door frame were all visible in the photograph.  (*Id*. at 413).  Flechtner identified State's exhibit 4 as an additional photograph of the interior of the apartment and State's exhibits 5 and 6 as photographs of the damage to the door frame. (*Id*. at 414-415, 419-420).  Flechtner testified that the apartment door appeared to have been forced open, and the damage to the door was "quite extensive, more than a couple of inches." (*Id*. at 419).  Flechtner testified that he maintained custody of Snyder's body (photographed in State's exhibit 7), bagged Snyder's hands to preserve evidence, and Snyder's body was released to the county coroner.  (*Id*. at 423-424).   On cross-examination, Flechtner testified that he was not aware if the baseball bat was involved in the incident.  (*Id*. at 427-428). Flechtner testified that he did not observe any signs that Garberson was intoxicated.  (*Id*. at 429).   Flechtner testified that he did not observe a bullet hole in the door, but he did notice damage to the door frame.   (*Id*. at 432-433).  On re-direct, Flechtner testified that he was primarily concerned with officer safety and patient care when he arrived on scene, and he only noticed the damage to the door frame since it was visibly noticeable upon entering the apartment. (*Id*. at 433-434).

{¶38} Robert Wood ("Wood") testified that, in October 2009, he was an over-the-road heavy-haul truck driver for Hunt Transportation based in Omaha, Nebraska.  (*Id*. at 436-437).  Wood testified that, on Sunday, October 18, 2009, he

was at the Petro Truck Stop in North Baltimore, Ohio. (*Id*. at 437-438). Wood testified that he was walking his dog along some railroad tracks near the truck stop when he found the bottom half of a gun. (*Id*. at 439). Wood testified that he picked it up thinking it was a toy but immediately realized it was part of gun, so he called the Sheriff's Office. (*Id*.). Wood took a deputy out to retrieve the gun, and he told the deputy that he did not know where the rest of the gun was located. (*Id*. at 439-440).

{¶39} Samantha Garberson ("Garberson") testified that, on October 18, 2009, she resided at 2200 Jennifer Lane, Findlay, Ohio Apartment 8, in Hancock County. (*Id*. at 447-448). The apartment complex is a two-story building, with four apartments upstairs and four apartments downstairs and two entrance doors, according to Garberson. (*Id*. at 448). Garberson testified that apartments one through four are on the first floor, and apartments five through eight are on the second floor. (*Id*. at 449). She testified that, in October 2009, Stacey Daniels and Cornelius Patterson lived in Apartment 1. (*Id*. at 451). Garberson testified that Snyder, who was her ex-boyfriend, and her son lived with her in Apartment 8. (*Id*. at 452). Garberson testified that two of Stacey's children were living with Patterson and her, and that she met Stacey since their children went to school together. (*Id*. at 453-454). Garberson testified that she knew Patterson as "Diamond." (*Id*. at 455).

{¶40} Garberson testified that, early in the afternoon of October 17, 2009, Stacey and three of Stacey's daughters, Stacey's niece, Patterson (who she knew as "Diamond"), and she went to Stacey's parents' home in Cygnet to celebrate several October birthdays in Stacey's family. (*Id*. at 454-458). Patterson drove them to the party in Stacey's black Mazda (photographed in State's exhibits 9 and 10) according to Garberson. (*Id*. at 458). Snyder did not attend the party since he had to work. (*Id*. at 458). Garberson testified that they returned to the apartment complex, and Stacey and she left between 8:00 and 9:00 p.m. to go drinking at the Yucatan Bar. (*Id*. at 462-463). Garberson testified she did not get intoxicated that night, but Stacy did. (*Id*. at 463-464). The bartender did not allow Stacey to drink anymore after 1:00 a.m., and they stayed at the bar until it closed at 2:00 a.m., according to Garberson. (*Id*. at 464). Garberson testified that they then drove back to the apartment complex, and they went to their respective apartments. (*Id*. at 464-465). Garberson testified that, soon thereafter, Snyder told her that someone was knocking on their apartment door, so she opened the door and saw Jada and Keandra, Stacey's daughter and niece, respectively. (*Id*. at 465). Jada and Keandra stated that Stacey had left the apartment, so she told the girls to go back to their apartment and she would try to contact Stacey. (*Id*. at 466). Garberson testified that she tried calling Stacey several times with no success, but Stacey eventually called her back. (*Id*. at 467). Garberson testified that she was

worried about Stacey and told Stacey that her children, her niece, and she could all stay at her apartment for the night. (*Id*.). Garberson testified that, when Stacey arrived at her apartment, she was "[v]ery angry and frantic," pacing and shaking because of her anger. (*Id*. at 468). After Garberson left Stacey in her bedroom, Garberson had an argument with Snyder about a man's phone number he had found in her phone. (*Id*. at 469, 503). Stacey came out of the bedroom to defend Garberson, and Snyder told Stacey to mind her own business and leave him alone. (*Id*. at 470).

{¶41} Garberson testified that Stacey and she were tired of arguing with Snyder, so they took the kids and went to Stacey's apartment. (*Id*.). Garberson testified that Stacey did not have her key, so she started banging on the apartment door; and then, Diamond flung open the door, grabbed Stacey by the throat, threw her to the ground, and began choking her. (*Id*. at 470-472). Garberson testified that Diamond eventually released Stacey, and they began to talk. (*Id*. at 473). Garberson testified that, after talking with Stacey, Diamond became upset and went upstairs with a black handgun (State's exhibit 11). (*Id*. at 473-476). Garberson testified that she thought Diamond was going to scare Snyder with the gun. (*Id*. at 477). Garberson stayed at the bottom of the stairwell until she heard Diamond kicking in the apartment door when she began to go up the stairs. (*Id*. at 478). Garberson testified that, when she came up the stairs, she saw Diamond

standing in front of her apartment door holding the gun in his right hand with his arms down in front of him. (*Id*. at 479).  Snyder was lying inside the apartment on the floor yelling for help, according to Garberson.  (*Id*. at 480).  Garberson testified that Stacey, Diamond, and the four children left the apartment complex out the back door soon thereafter. (*Id*. at 481).  Garberson testified that she did not see a gunshot wound or any blood on Snyder; rather, she thought Snyder was in shock, so she called 9-1-1 and tried to figure out what was wrong with him.  (*Id*. at 480-482).  Snyder was very faint of breath and tried to get up but could not hold himself up, according to Garberson.  (*Id*. at 482).

{¶42} Garberson testified that the apartment door frame was busted from being kicked in.  (*Id*. at 483).  She identified State's exhibit 2 as a diagram of her apartment, and she testified that Snyder was sleeping on the bed on the living room floor.  (*Id*. at 483-484).  Garberson identified State's exhibit 3 as a photograph of her apartment and testified that the damage to the door was freshly done the night of the incident. (*Id*. at 486).  Garberson identified State's exhibit 12 as "a little piece that goes over top of the door latch" she saw "laying on the floor." (*Id*. at 489).  Garberson testified that she did not have any damage or bullet holes in her door (State's exhibit 13) prior to the incident.  (*Id*. at 489-491).  Garberson identified State's exhibit 7 as a photograph of Snyder.  (*Id*. at 492).

{¶43} On cross-examination, Garberson testified that Snyder moved in with her about a month after she obtained the apartment. (*Id*. at 495). She testified that she broke up with Snyder because they argued frequently, and that she had asked Snyder to leave the apartment, but he had no place to go. (*Id*. at 496). Garberson testified that they arrived at the party in Cygnet between 2:00 and 3:00 p.m., and that both Stacey and she were drinking alcohol at the party. (*Id*. at 497). Garberson testified that Snyder was not physical when they were arguing. (*Id*. at 504). Garberson testified that the argument between Snyder, Stacey, and her occurred around 3:00 a.m., but she denied that Snyder threatened Stacey during the argument. (*Id*. at 506-507). Garberson testified that, after she went down to Apartment 1 and was sitting on the steps, she saw Snyder come out to the landing on the second floor and look down. (*Id*. at 510). Garberson denied seeing Snyder with a baseball bat and denied hearing Snyder say anything while he was standing on the landing. (*Id*. at 511). She testified that she could not see Apartment 8 from where she was sitting on the stairs, and that she stayed sitting when Patterson went up the stairs. (*Id*. at 511-512). Garberson testified that she has never seen a door being kicked in, and she did not really know what a door being kicked in sounds like, but she heard a noise. (*Id*. at 514). She testified that she did not know who fired the gun, and that she did not notice a bullet hole in the door that night. (*Id*. at 515). Garberson testified that she recalled saying during the 9-1-1 conversation

that her ex-boyfriend was acting like a fool. (*Id.* at 517). She could not recall whether or not she stated that Snyder was intoxicated during that phone call. (*Id.* at 518). Garberson also admitted that she told the 9-1-1 operator that she heard the gunshot first, and then she heard the door being kicked in, but she testified that she was mistaken. (*Id.* at 519). Garberson further testified that she recalled telling the 9-1-1 operator that Snyder was drinking alcohol when the operator asked. (*Id.*).

{¶44} On re-direct, Garberson testified that she did not drink anything when she returned to the apartment from the bar. (*Id.* at 521). She testified that Snyder came out of the apartment after Diamond attacked Stacey, and, thereafter, Snyder went back into the apartment. (*Id.* at 526). Garberson testified that she has heard the sound of wood breaking before, and she heard gunshots during her time with the National Guard. (*Id.*). She testified that she thought Diamond was just scaring Snyder, and that she did not actually see Diamond shoot the gun. (*Id.* at 527).

{¶45} Jay Myers ("Myers"), a Findlay Police Department detective, testified that, around 5:30 a.m. on October 18, 2009, Captain Horne advised him that a homicide occurred at 2200 Jennifer Lane, Findlay, Hancock County, Ohio. (Feb. 10, 2011 Tr. at 538, 540-541). Myers testified that he observed damage to the apartment door frame, and that it appeared that the door had been forced open. (*Id.* at 541). Myers identified State's exhibit 5 as a photograph of the doorway to

Apartment 8 taken from the hallway just outside the apartment. (*Id*. at 542). Myers testified that the door to the apartment opened inside the apartment. (*Id*.). Myers identified State's exhibit 12 as the missing deadbolt lock plate he located on the living room floor of the apartment. (*Id*. at 544). Myers identified State's exhibit 15 as a photograph of the apartment living room with placards placed on the floor marking where the blood stains were found on the floor. (*Id*. at 545). Myers testified that they searched Apartment 1, but did not locate the suspect inside the apartment at that time, so they decided to process Apartment 8 for evidence. (*Id*. at 551-552). Law enforcement collected samples of the blood stain, the bloody towel, and the aluminum softball bat from Apartment 8. (*Id*. at 552-553). From Apartment 1, law enforcement seized a box of Lellier and Bellot 7.62x25 Tokarev caliber ammunition found in the bedroom closet. (*Id*. at 553-554). Myers identified State's exhibits 17 and 18 as photographs of the box of ammunition seized from Apartment 1, and State's exhibit 19 as the box of ammunition itself. (*Id*. at 554-556). Myers also testified that, from Apartment 1, they seized court paperwork identifying the occupants of the apartment as Stacey Daniels (a.k.a. Stacey Combs) and Cornelius Patterson, Jr., and a State Farm Insurance card for Gary Combs to a 1997 Nissan Maxima (State's Ex. 20). (*Id*. at 557-558).

{¶46} Myers further testified that, as he was walking through the laundry room on the first floor, he located a shell casing, which was photographed in State's exhibits 21 and 22. (*Id.* at 559). Myers testified that Wood County Sheriff's Deputy Cardenas showed him the frame (handle) of a handgun found in North Baltimore, and Myers thought the handgun could have been used in the Findlay shooting. (*Id.* at 562). Myers accompanied Deputy Cardenas back to the area where the frame of the handgun was found and was able to locate the slide of the handgun along the edge of the road using a metal detector. (*Id.* at 562-563). Myers identified State's exhibit 11 as the 7.62 Tok Czech handgun law enforcement recovered in North Baltimore. (*Id.* at 564). Myers testified that the handgun had a round in the chamber when it was found, but they were unable to find the magazine. (*Id.* at 563-564). Myers testified that the handgun slide was found about a quarter to a half-mile further down the same road as the frame (handle) of the handgun was found, indicative of someone throwing it from a car as it was traveling down the road. (*Id.* at 565). Myers identified: State's exhibit 23 as a photograph of the location where they found the handgun slide; State's exhibit 24 as a photograph of the address of the residence on Galatea Road near where the slide of the handgun was located; and State's exhibits 25 and 26 as photographs of the handgun slide in the grass alongside Galatea Road. (*Id.* at 565-567). Myers testified that he went to the Lucas County Coroner's Office to

observe Snyder's autopsy and recovered the bullet from Snyder's body, which Myers identified as State's exhibit 27. (*Id*. at 568-571). Myers testified that he returned to Apartment 8 and discovered a hole in the apartment door (State's exhibit 13), which appeared to be a caused from a gunshot. (*Id*. at 579-581). Myers identified State's exhibit 34 as two ATM receipts, time stamped October 18, 2009 at 2:54 a.m. from 1701 Melrose Ave., recovered from a search of the 1997 Nissan Maxima. (*Id*. at 586).

{¶47} On cross-examination, Myers testified that he found a Wilson aluminum softball bat near the front entrance of the apartment. (*Id*. at 596-597). According to Myers, other law enforcement officers indicated that the softball bat was part of the argument between Snyder and the other individuals. (*Id*. at 597-598). Myers testified that, from State's exhibit 3, he could see around six to seven Bud Light beers near the couch in Apartment 8. (*Id*. at 600-602). Myers testified that law enforcement originally thought the hole in the apartment door was an old bullet hole since it appeared to be repaired. (*Id*. at 603). He testified that their investigation eventually lead them to believe that the bullet that killed Snyder passed through the apartment door. (*Id*. at 605). Myers testified that he recovered very small wood particles from the victim's shirt near the bullet wound. (*Id*. at 608-609). Myers testified that, based upon the location of the bullet wound, the small wood fibers near the entrance of the wound, and the angle the bullet entered

Snyder's body, law enforcement theorized that Snyder was "either shutting the door or closing the door, or holding it closed" when he was shot. (*Id*. at 609-611). Myers testified that the bullet seized from Snyder's body was in "excellent condition," which negatively impacted their theory that the bullet traveled through the door. (*Id*. at 613). On re-direct, Myers testified that law enforcement never suspected anyone besides Patterson throughout the course of the investigation, and law enforcement never suspected any weapon other than the recovered 7.62 Tok Czech handgun. (*Id*. at 615). Myers testified that Snyder had some small pinpoint abrasions appearing in a conical pattern under his right wrist, which supported law enforcement's theory that Snyder had his right arm on the door when the bullet traveled through the door and into his body. (*Id*. at 618-619).

{¶48} Nicholas Trausch ("Trausch") testified that, on October 18, 2009, his girlfriend, Teresa Sharp, his daughter, and he were living at 2200 Jennifer Lane, Apartment 4, and Apartment 8 was directly above their apartment. (*Id*. at 623, 626). Trausch testified that he knew the girl who lived in Apartment 8 as "Sam," but he did not know the man who lived with her. (*Id*.). He testified that Stacey, Diamond, and two children, Saphire and Lela, lived in Apartment 1. (*Id*. at 627-628). Trausch testified that, on Saturday night October 17, 2009, he was awakened by a loud noise and yelling coming from the upstairs apartment, so he opened his apartment door and asked the two girls he saw standing upstairs to

"please keep it down." (*Id*. at 630). Trausch testified that the girls were 12 or 13 years old, and he thought they were either Stacey's or Diamond's daughters. (*Id*. at 630-631). Trausch testified that he was awakened again shortly thereafter by loud screaming and yelling, so he went out of his apartment towards the front door of the apartment complex where he observed Sam sitting on the steps. (*Id*.). Trausch testified that, as he was talking with Sam, Stacey and Diamond emerged from an area near Apartment 2 arguing, and "Diamond [was] saying, give me my gun, where is my gun, and Stacey [was] holding her purse against her chest." (*Id*. at 633-634). Trausch testified that he heard someone coming from upstairs and "clink, clink, clink" sounds, and then Diamond said to Stacey, again, give me my gun. (*Id*. at 634). According to Trausch, Diamond reached into Stacey's purse, pulled out the gun, and he heard running coming from upstairs, as if the person upstairs was running toward the area where his apartment was located. (*Id*. at 634-635). After Diamond ran up the stairs, Trausch ran toward his apartment but, before he went into his apartment, he heard the door to Apartment 8 slam and lock. (*Id*. at 635). Trausch testified that he then heard "right around three" kicks to the apartment door, and then he heard wood breaking, at which point he exited his apartment, approached the stair landing, and then heard a gunshot. (*Id*. at 636, 639). Trausch testified that he continued up the stairs where he saw Diamond "still holding the gun right at the door," and the door was slightly open. (*Id*. at

637). Trausch testified he was "pretty sure" that Diamond was holding the gun "straight out in front him." (*Id*. at 638).

{¶49} On cross-examination, Trausch testified that it sounded like the person coming down the steps had "something in his hand * * * that was going to cause harm." (*Id*. at 652). Trausch testified that he wrote in his statement that the man from upstairs was carrying a ball bat, though he did not recall actually seeing the man. (*Id*. at 658, 664). Trausch testified that he saw Patterson standing right in front of the door in the hallway, not in the apartment. (*Id*.). Trausch testified that he remembered Patterson "saying you got hit or something along them lines, or you ain't hit, something like that." (*Id*. at 668). When asked to clarify Patterson's statements, Trausch testified that Patterson first asked Snyder whether he was hit or not, and then made the statement that Snyder was not hit. (*Id*. at 671, 682-683). Trausch testified that he did not know whether or not the apartment door was open or closed when the gunshot went off. (*Id*. at 672). On re-direct, Trausch testified that he never saw the man coming down from upstairs, but he assumed it was Snyder. (*Id*. at 678). He also "figured" Snyder was carrying a baseball bat since he heard something metallic or aluminum. (*Id*.). Trausch considered Patterson a friend, but he did not know Snyder. (*Id*. at 682-683).

{¶50} Keandra Gipson ("Gipson") testified that she is sixteen years old; she lives with her grandmother, Barbara Combs, in Cygnet; and, Stacey Combs is her

aunt. (*Id*. at 690-692). Gipson testified that, in October 2009, Stacey lived with her children, Saphire and Aaliyah, and Diamond in the Melrose Apartments in Findlay, Ohio. (*Id*. at 692-694). Gipson testified that she attended a party on October 18, 2009 for all the October birthdays in the family. (*Id*. at 694-695). Stacey brought Samantha, her friend who lived in the apartment above her, and Diamond to the party, according to Gipson. (*Id*. at 695-696). Gipson testified that Diamond wanted to leave the party because Stacey was drinking, so Stacey's daughter, Jada, and Gipson left with him. (*Id*. at 696). Gipson testified that they had just driven over the overpass when Stacey called and was ready to leave the party, so they drove back and picked up Stacey, along with Samantha, Saphire, and Aaliyah. (*Id*. at 696-697). When they arrived at the apartment, the group continued the birthday party by cutting Jada's cake, testified Gipson. (*Id*. at 697). About a half-hour after they arrived, Diamond and Stacey started arguing in the bedroom, and, after that, Diamond went across the street to the other apartments and Stacey and Samantha went to a bar, according to Gipson. (*Id*. at 698-700). Gipson testified that, when Diamond returned to the apartment he was upset that Stacey had not yet returned and threatened to kill Stacey, so Jada called Stacey after Diamond left the apartment. (*Id*. at 701-702). When Stacey returned, Stacey drove all the children over to the apartments across the street where she parked the car, exited the vehicle, and began yelling for five or ten minutes, testified Gipson.

(*Id*. at 703-704). After that, Stacey returned to the vehicle, and they drove to the bank where Stacey unsuccessfully attempted to withdraw money to purchase gas to drive to Stacey's father's house in Van Buren. (*Id*. at 704-705). Gipson testified that, during the trip to the bank, she observed a black gun on the front passenger side floorboard by her feet. (*Id*. at 706).

{¶51} Gipson testified that they went back to Samantha's apartment until the man living with her threatened Stacey, so they left and went back to Apartment 1. (*Id*. at 706-707). When they arrived at Apartment 1, Diamond came out and knocked Stacey down, and they continued to argue near the stair landing, according to Gipson. (*Id*. at 708). Gipson testified that Stacey had the gun in her purse at that time. (*Id*. at 708-709). She also testified that the other children and she went into Apartment 1 and closed the door, and thereafter, heard a loud bang. (*Id*. at 709-710). Gipson testified that, after hearing the loud bang, she left with Stacey, Diamond, and the children out the back door of the apartment complex, and Diamond drove all of them to Gipson's house. (*Id*. at 710-711). According to Gipson, during the car ride, Stacey wiped off the gun with her shirt sleeve; Diamond disassembled the gun into two parts; and, Diamond threw the gun parts out of the car window near some railroad tracks. (*Id*. at 712-713). Gipson testified that Diamond threw out the two gun parts at different times, one time near a small town called Bairdstown. (*Id*. at 713-714). Gipson testified that Diamond

then dropped her off at her grandmother's apartment in Cygnet. (*Id.* at 714). On cross-examination, Gipson testified that she recalled telling law enforcement that she turned on her Ipod after she went back into Apartment 1 and did not hear anything after that. (*Id.* at 718). Gipson also testified that, when she spoke with law enforcement, she did not mention anything about seeing the gun when Diamond was returning her home to Cygnet. (*Id.* at 727). On re-direct, Gipson testified that she remembers seeing the gun today even though she did not mention it earlier. (*Id.* at 728).

{¶52} Barbara Combs ("Barbara") testified that, in October 2009, she was living with her fiancé, Ron Mclain, and her granddaughter, Kendra, in Cygnet, Ohio. (*Id.* at 729-730). Barbara testified that: Stacey was her daughter, and Stacey had four children, Jasmine (15), Jada (11), Saphire (5 or 6), and Aaliyah (3); Stacey's father, Gary Combs, lives in Van Buren; and, Patterson is Stacey's boyfriend. (*Id.* at 732-733). Barbara testified that, around 5:00 a.m. on the morning of October 18, 2009, her granddaughters showed up at her house unexpectedly. (*Id.* at 733-734). Barbara testified that her granddaughters were not at her house when she returned home from work later that day. (*Id.* at 734).

{¶53} Pamela Ackerman ("Ackerman") testified that, in October 2009, she was living with her fiancé, Gary Combs, in Van Buren, Ohio. (*Id.* at 736). Ackerman testified that Stacey called Gary early in the morning on October 18,

2009 asking him to pick them up since they ran out of gas on the interstate. (*Id*. at 737). Ackerman testified that, after talking with Gary, Stacey's sister, Angie, and she went to find Stacey's vehicle, which was parked south of the northbound rest area. (*Id*. at 739). Ackerman testified that no one was with the vehicle, so they drove up to the Bowling Green exit checking gas stations for Stacey and Patterson. (*Id*.). Ackerman testified that they did not find them there, so she met up with Gary at the southbound rest area. (*Id*. at 740). She testified that she left Angie with Gary, and she went back to the vehicle again but did not see anyone there. (*Id*. at 741). Ackerman further testified that, while she was gone, Stacey called Gary, so Angie and he went to pick them up. (*Id*. at 741). Ackerman testified that, later that day, she picked up Gary's granddaughters from Barb Comb's apartment and brought them home. (*Id*. at 741-742).

{¶54} Timothy Gilbert ("Gilbert") testified that he lives in Bowling Green, Ohio with his girlfriend, Robin Bankey. (*Id*. at 743). Gilbert testified that, around 6:30 a.m. on October 18, 2009, Diamond and his niece, Stacey, came to his house unexpectedly. (*Id*. at 745-747). Gilbert testified that Stacey was "a little upset" and used their phone to call Gary Combs, who came to pick them up. (*Id*. at 748-749).

{¶55} Gary Combs ("Combs") testified that, around 5:20 a.m. on October 18, 2009, he received a phone call from his daughter, Stacey, informing him that

-35-

she had run out of gas while traveling on I-75 towards Toledo. (*Id*. at 751-752).

He testified that he located the vehicle south of the rest area on I-75, but he did not

find Stacey or Diamond with the vehicle, so he drove around Bowling Green to

find them. (*Id*. at 752). Combs testified that he drove back to the rest area, and

Stacey called and asked him to pick them up at Tim Gilbert's house in Bowling

Green. (*Id*. at 752, 754). Combs testified that he dropped Stacey and Diamond off

in Toledo, though he was not sure exactly where in Toledo. (*Id*. at 755). Combs

testified that, later that day, he was contacted by the Findlay police, and the police

indicated that his daughter was in danger. (*Id*. at 756-757, 759). Combs then

returned to the house where he had dropped off Stacey and Patterson, and he gave

the address to the Findlay police. (*Id*. at 758-759).

**{¶56}** David Bright ("Bright"), a police officer with the City of Toledo,

testified that, on October 18, 2009, he served an arrest warrant upon Patterson at

4777 Santa Maria, Toledo, Ohio. (*Id*. at 761-762). Bright identified Patterson as

the person arrested that day. (*Id*. at 765).

**{¶57}** David Claflin ("Claflin") testified that, around 1:00 p.m. on October

18, 2009 while he was employed as a Findlay police officer, he responded to mile

post 178 on I-75 to locate a suspect's vehicle. (*Id*. at 769-771). Claflin described

the vehicle as a 1997 Nissan Maxima, depicted in State's exhibits 9 and 10. (*Id*. at

771). Claflin testified that he conducted an inventory search of the vehicle and then sealed the car with evidence tape for towing. (*Id*. at 771-772).

**{¶58}** Wood County Sherriff's Deputy Samuel Cardenas ("Cardenas") testified that, on October 18, 2009, he was dispatched to North Baltimore, Ohio because a truck driver had located part of a weapon alongside the roadway. (*Id*. at 776-779). Cardenas testified that he spoke with the truck driver, Woods, who took him to the west side of Galatea Road where he discovered the lower half frame of a handgun. (*Id*. at 779-780). Later that same day, the Findlay Police Department called and inquired about the weapon believing it might have been involved in the shooting, according to Cardenas. Cardenas testified that he met Findlay police detectives in the area where part of the firearm was located, and they began searching the area for the other portion of the handgun. (*Id*. at 781-782). Cardenas testified that he located the handgun slide about 50 to 75 yards north from where the handgun frame was found. (*Id*. at 782). Cardenas identified: State's exhibit 23 as a photograph of the area where the handgun slide was found; State's exhibit 24 as a photograph of the house near where the handgun slide was found; and, State's exhibits 25 and 26 as photographs of the handgun slide. (*Id*. at 782-784).

**{¶59}** Dr. Maneesha Pandey ("Dr. Pandey"), a deputy coroner and forensic pathologist at the Lucas County Coroner's Office, identified State's exhibit 39 as

David Snyder's autopsy report and State's exhibit 7 as a photograph of Snyder. (*Id*. at 790, 799, 801). Dr. Pandey testified that the autopsy was conducted in Lucas County at the request of Hancock County Coroner, Dr. Fox. (*Id*. at 800). She testified that she observed blood on the right side of Snyder's hand, and a hole in Snyder's t-shirt under the right armpit area. (*Id*. at 802-803). Dr. Pandey identified: State's exhibit 40 as photograph of Snyder's black t-shirt with a white arrow indicating where the hole was located on the t-shirt; and, State's exhibit 41 as a close-up photograph of the hole in the t-shirt. (*Id*. at 803-804). Dr. Pandey testified that Snyder's gunshot wound was eight inches right of his anterior midline and 13½ inches beneath the top of his head. (*Id*. at 806-807, 831). Dr. Pandey also testified that Snyder had recent injuries to his right forearm, wrist, and elbow, which were photographed in State's exhibits 42-44. (*Id*. at 807-809). She testified that they x-rayed Snyder's chest and abdomen and found the bullet (State's exhibit 27) just under the skin in Snyder's lower left back. (*Id*. at 810-811, 823, 825). Dr. Pandey testified that the projectile traveled through Snyder's right seventh rib, through the right lower lobe of Snyder's lung, through his T-10 and T-11 thoracic vertebrae, and then into his back. (*Id*. at 813). Dr. Pandey identified State's exhibit 47 as a photograph of Snyder's emptied body cavity and a metallic probe, which was inserted at the wound's entrance and which tracks the trajectory of the bullet. (*Id*. at 824). Snyder had ethanol, alcohol,

diphenhydramine, and atropine in his blood and marijuana in his urine, according to Dr. Pandey. (*Id*. at 827). She testified that atropine is usually administered when medical professionals are attempting to resuscitate someone. (*Id*. at 828). Dr. Pandey testified that she identified foreign material embedded in the skin of Snyder's right wrist, which was consistent with the bullet passing through a wood door before hitting Snyder. (*Id*. at 828-830).

{¶60} On cross-examination, Dr. Pandey testified that Snyder's blood alcohol level was "point 11 percent, which is higher than the legal limit * * * point 08 percent" and Snyder's marijuana level measured 42 nanograms/ml of urine. (*Id*. at 833). She testified that she did not see any blood on Snyder's t-shirt. (*Id*. at 834). Since the bullet lacerated the spinal cord, Snyder may well have been paralyzed from the legs down, according to Dr. Pandey. (*Id*. at 835). Dr. Pandey testified that the abrasions on Snyder's elbows would be consistent with carpet burns. (*Id*. at 835-836). She testified that she was unable to locate any stippling near the entrance of the bullet wound, like the stippling she located on Snyder's wrist. (*Id*. at 836). Dr. Pandey testified that she was unable to identify the foreign material in Snyder's wrist. (*Id*. at 836-837). On re-direct, Dr. Pandey testified that she was unable to determine how long the marijuana was in Snyder's system, but generally marijuana stays in a person's urine for a few days. (*Id*. at 839-840). She testified that the fact that Snyder had pseudo stippling on his wrist and not

near the entrance of the wound indicates that Snyder's wrist was closer to the door than his body. (*Id*. at 841). Dr. Pandey also testified that it is possible that the bruising on Snyder's elbows was caused by the door. (*Id*.).

{¶61} Dr. Mark Fox ("Dr. Fox"), the Hancock County Coroner, identified State's exhibit 39 as David Snyder's autopsy report, which he received from Dr. Pandey. (*Id*. at 851, 856). Dr. Fox testified that Snyder died of a gunshot wound to the torso/chest area, and the manner of death was a homicide. (*Id*. at 857). Dr. Fox identified State's exhibit 48 as a copy of the death certificate. (*Id*. at 857-858).

{¶62} Julie Cox ("Cox"), a forensic scientist at the Ohio Bureau of Criminal Identification and Investigation ("BCI"), identified State's exhibit 50 as a copy of her DNA report. (*Id*. at 859-860, 868). Cox testified that she identified a partial DNA profile consistent with Patterson on the handgun slide. (*Id*. at 873-874). On cross-examination, Cox testified that there is no way to determine what kind of biological fluid the DNA came from. (*Id*. at 884). She testified that she was unable to obtain sufficient DNA from items 1.3, the cartridge swab, and 2.1, the handgun trigger swab, to make any DNA comparison. (*Id*. at 885-886). Cox testified that the only DNA recoverable from the handgun trigger was consistent with a female. (*Id*. at 886-887). Cox further testified that Wood was not the source of the additional DNA found on the slide of the handgun. (*Id*. at 888-889).

On re-direct, Cox testified that the DNA on the handgun slide was from a male and consistent with Patterson's DNA. (*Id*. at 891). Cox further testified that the amount of DNA transferred to an object by touching it is much less than the amount of DNA found in biological fluids. (*Id*. at 894-895).

{¶63} Todd Wharton ("Wharton"), a forensic scientist in the firearms and tool mark section of BCI, identified State's exhibit 11 as a Czechoslovakian semi-automatic firearm chambered in 7.62 Tokarev, model number CZ52. (*Id*. at 896-897, 905). Wharton testified that he swabbed the firearm and a cartridge for DNA. (*Id*. at 906). Wharton testified that the weapon was operable, and he test-fired the weapon twice with the 7.62 Torkarev caliber cartridges (State's exhibit 19) to acquire bullets to compare with the bullet submitted into evidence (State's exhibit 27). (*Id*. at 907-911, 914, 917, 919). Wharton identified State's exhibit 51 as the bullets he recovered from the test fires and State's exhibit 35 as the fired cartridge law enforcement submitted into evidence. (*Id*. at 915, 920). Wharton testified that the test-fired bullets and the submitted bullet had some matching individual characteristics to the firearm (State's Exhibit 11) but not enough for a positive identification of the weapon. (*Id*. at 925-927). Wharton testified that some firearms leave a significant amount of identifying characteristics on the fired bullet, and some firearms do not, depending upon the firearm's manufacturer, age, and use. (*Id*. at 927). Firing a bullet through a wooden door would affect one's

ability to identify the individual characteristics on the bullet, according to Wharton. (*Id.*). Wharton testified that he analyzed a door from the apartment complex (State's exhibit 13), and the hole in the door tested positive for the presence of lead. (*Id.* at 930, 932, 934). Wharton further testified that he test-fired the weapon at the door, and determined that the weapon was less than one foot from the door when it was fired. (*Id.* at 934-940). On cross-examination, Wharton testified that any handgun chambered in 7.62 Tokarev with right-handed rifling twist and four lands and four groves could have fired the round submitted into evidence. (*Id.* at 947). Wharton testified that he did not examine the angle in which the projectile was fired through the door. (*Id.* at 959).

{¶64} Rodney Hampton ("Hampton"), an inmate at the Correction Reception Center, testified that he made a plea deal with the Hancock County Prosecutor's Office in exchange for his testimony at trial. (*Id.* at 979-983, 994-995). Hampton testified that he had a drug conviction out of Seneca County and an aggravated robbery conviction and tampering with records conviction out of Wood County. (*Id.* at 984-985). He testified that he first met Patterson, who he knew as "Diamond," around November 20, 2009, and they became friends/acquaintances. (*Id.* at 986). According to Hampton, Diamond stated that his case started with an argument between the victim and his wife. (*Id.* at 987-988). Hampton testified that Diamond told him that a 9 millimeter gun was found,

and that the bullets would not match up with the gun since some characteristics matched and some did not. (*Id*. at 989). Hampton testified that Diamond told him that he went to the victim's apartment, knocked on the door, and then began kicking the door, and the door opened. (*Id*.). Diamond was going to "pistol whip" or beat up the victim, according to Hampton. (*Id*. at 989-990). Hampton testified that Diamond told him that the victim was trying to hold the apartment door shut, and he was trying to get into the apartment but he could not, so he fired the gun through the door. (*Id*. at 990). Diamond stated that, after he fired the gun, the door opened, he saw the victim lying on the floor, so he fled to Toledo. (*Id*. at 990-991). Hampton testified that Diamond told him he knew the victim was shot, but he did not know the victim was dead. (*Id*.). Diamond also told Hampton that he tossed the gun, and that a truck driver found the gun. (*Id*. at 991). Hampton testified that Diamond was his only source of information concerning the case. (*Id*. at 992). On cross-examination, Hampton testified that he described the gun as a 9 millimeter in his written statement and while testifying at trial, but he did not describe the gun as a 9 millimeter in his oral statement. (*Id*. at 998-999). Hampton testified that his total prison term was reduced by as much as 15 years in exchange for his testimony in Patterson's trial. (*Id*. at 1005). On re-direct, Hampton testified that the trial court sentenced him to two years less than it could have under the plea agreement. (*Id*. at 1006). Hampton also testified that no one

from the prosecutor's office was with him when he wrote out his statement. (*Id*. at 1007). On re-cross, Hampton testified that he informed his attorney about the information he had on Patterson, and his attorney contacted the prosecutor's office *Id*. at 1008-1009).

{¶65} William Domme ("Domme"), a Findlay Police Department detective, testified that, during his investigation into the October 18, 2009 shooting, he interviewed Derrick Currie and Rodrick Stallings, who were both ruled out as suspects. (*Id*. at 1011-1013). Domme testified that Diamond was a suspect, and they learned that Diamond shared a cell phone number with Stacey Daniels. (*Id*. at 1013). Law enforcement requested cell phone records from Verizon Wireless and determined that a call had been placed to Pam Ackerman from the cell phone, testified Domme. (*Id*. at 1013-1014). Domme testified that Detective Tuttle and he went to Ackerman's home where he located four females, later identified as the children that were with Stacey and Diamond, and they learned of the location of Stacey and Diamond's vehicle. (*Id*. at 1014). The Findlay Police Department never released any specific details about the investigation to the news media, according to Domme. (*Id*. at 1022).

{¶66} Scott De Graaf ("De Graaf"), a patrol officer assigned to the detective division of the Findlay Police Department, testified that, when he responded to 2200 Jennifer Lane, Apartment 8, the apartment door was open, the

doorjamb was broken, and several items were on the floor, including a plate, a bat, blood stains, and a towel. (*Id*. at 1043). De Graaf identified: State's exhibit 3 as the photograph he took of Apartment 8; State's exhibit five as a photograph of the entrance to Apartment 8, which depicted damage to the door frame and strike plate; and, State's exhibit 6 as the photograph he took of the broken doorjamb. (*Id*. at 1043-1045). De Graaf testified that the apartment door's dead bolt was engaged and the lock plate (State's exhibit 12) was on the floor. (*Id*. at 1045). De Graaf identified: State's exhibit 17 as a photograph he took of a box of 7.62 x 25 Tokarev ammunition he located in the north bedroom closet of Apartment 1; State's exhibit 18 as a close-up photograph of the same box of ammunition; State's exhibit 20 as Gary Combs' State Farm Insurance card and Cornelius Patterson, Jr.'s Ohio I.D. card, both found in Apartment 1; State's exhibit 21 as a photograph he took of the apartment hallway with marker number eight next to a shell casing; State's exhibit 22 as a close-up photograph of the same shell casing; State's exhibit 23 as a photograph of the location where the slide and barrel to the handgun were found; State's exhibit 24 as a photograph showing the relationship between the location of the handgun slide to the residence at 1962 Galatea Road; State's exhibit 26 as a close-up photograph of the handgun slide and barrel with a scale; State's exhibit 37 as a three-photo composite of pictures he took of the stairway Trausch scaled when he observed Patterson; and, State's exhibit 54 as a

photograph he took of the hole in Apartment 8's door. (*Id*. at 1047-1049, 1051-1052, 1054, 1056). On cross-examination, De Graaf testified that the gun was found in Wood County. (*Id*. at 1060). He also testified that the ball bat was collected since it may have been used by one of the parties. (*Id*. at 1060-1061).

{¶67} Thereafter, the State moved for the admission of exhibits; the trial court admitted State's exhibits 1-4, 6-15, 17-30, 33-54, and defendant's exhibit E; and, the State rested. (*Id*. at 1071-1084). Patterson then made a Crim.R. 29(A) motion, which the trial court denied. (*Id*. at 1084-1091). Thereafter, the defense presented the testimony of one witness, Scott Schwab ("Schwab"). (*Id*. at 1094).

{¶68} Schwab testified that he is a licensed attorney practicing in Lucas County, Ohio, and that he knew Patterson after representing several of his family members over the years. (*Id*. at 1095-1097). Schwab testified that, on a Sunday in October 2009, Patterson and Patterson's mother, Mrs. Taylor, contacted him for the purpose of retaining him as counsel for the Findlay shooting. (*Id*. at 1097-1098). Schwab testified that, after talking with Patterson, he contacted the Findlay Police Department to discuss arrangements for Patterson to turn himself in. (*Id*. at 1098-1100). Schwab testified that, before Patterson was able to turn himself in, Patterson was arrested at a house owned by Patterson's aunt, Patricia Lawson. (*Id*. at 1100). On cross-examination, Schwab testified that he is representing Patterson on a pending personal injury case where Patterson is asking for

monetary damages for injuries he sustained as a result of a traffic accident. (*Id.* at 1101-1102).

{¶69} Thereafter, the defense played Samantha Garberson's 9-1-1 phone call. (*Id.* at 1105-1111); (Defendant's Ex. A). Defendant's exhibits A and C were admitted into evidence, and the defense rested. (*Id.* at 1115). The jury found Patterson guilty of all four counts and the firearm specifications. (*Id.* at 1255-1267).

{¶70} Viewing the evidence in a light most favorable to the State, a rational trier of fact could have concluded that Patterson trespassed into Snyder's apartment. The physical and testimonial evidence at trial demonstrated that: Snyder's apartment door opened into his apartment; Patterson kicked in Snyder's apartment door; Snyder was struggling to hold his apartment door closed to prevent Patterson from entering; and, Patterson fired his weapon while the apartment door was partially opened. From this evidence, a rational trier of fact could have concluded that part of Patterson's body crossed the threshold of the apartment door. "[E]vidence of the insertion of any part of the body into an occupied dwelling is sufficient to constitute a trespass for the purpose of establishing a burglary offense." *State v. Wright*, 3d Dist. No. 5-01-10 (Aug. 24, 2001), *4, citing *State v. Burns*, 3d Dist. No. 9-98-21 (Mar. 15, 1999), citing *State v. Smith*, 10th Dist. No. 94APA04-502 (Nov. 15, 1994). Since the State presented

sufficient evidence showing a trespass, and thereby, the aggravated burglary offense, Patterson's aggravated felony murder conviction was also supported by sufficient evidence with respect to the aggravated burglary element.

{¶71} Next, Patterson argues that the State failed to present sufficient evidence that he purposefully caused Snyder's death. We disagree. "A person acts purposely when it is his specific intention to cause a certain result * * *." R.C. 2901.22(A). However, "[b]ecause the intent of an accused dwells in his or her mind and can never be proved by the direct testimony of a third person, it must be gathered from the surrounding facts and circumstances * * * ." *Treesh*, 90 Ohio St.3d at 484-485. The evidence presented at trial demonstrated that Snyder had an argument with Patterson's girlfriend, Stacey, and, after Stacey told Patterson about the argument, Patterson asked for Stacey's gun. After chasing Snyder back into his apartment and kicking in the apartment door, Patterson began pushing on the door as Snyder was holding the door closed. During that struggle, Patterson cocked, pointed, and fired the gun directly at the apartment door, knowing that Snyder was directly behind the door. Notably, Patterson did not fire the gun toward the ceiling, the ground, or even the door knob in an effort to gain entrance; there is no evidence that the bullet struck Patterson after ricocheting in some unforeseen manner. Rather, the evidence presented demonstrated that Patterson fired the gun at Snyder's center of mass, indicative of Patterson's intent to kill

Snyder. Furthermore, after reviewing the record, we cannot conclude that Patterson's aggravated felony murder conviction was against the manifest weight of the evidence.

{¶72} In his fifth assignment of error, Patterson argues that the trial court erred by failing to dismiss the tampering with evidence conviction for lack of venue. We disagree.

{¶73} Although venue is not a material element of any criminal offense, it must nevertheless be proven at trial beyond a reasonable doubt, unless waived. *State v. Draggo*, 65 Ohio St.2d 88, 90 (1981). "[V]enue need not be proved in express terms so long as it is established by all the facts and circumstances in the case." *State v. Lee*, 3d Dist. No. 14-06-18, 2006-Ohio-6091, ¶ 14, citing *State v. Headley*, 6 Ohio St.3d 475, 477 (1983); *State v. Connell*, 6th Dist. No. H-03-026, 2005-Ohio-3202. R.C. 2901.12, governing venue, provides, in relevant part:

(A) The trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed.

* * *

(H) When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried

for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred.

**{¶74}** R.C. 2921.12(A)(1), under which Patterson was convicted, provides the elements for the criminal offense of tampering with evidence as follows:

[n]o person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall * * * [a]lter, destroy, conceal, or remove any * * * thing, with purpose to impair its value or availability as evidence in such proceeding or investigation * * *.

**{¶75}** Viewed in a light most favorable to the State, the evidence at trial demonstrated that Patterson removed the gun he used to shoot Snyder from the crime scene, which was in Hancock County. A reasonable juror also could have concluded that, when Patterson removed the gun and fled to Toledo, he knew that an investigation was likely to occur. Finally, given Patterson disassembled the gun and threw it out of the car window while driving to Toledo, a rational trier of fact could have conclude that he removed the gun from Hancock County with purpose to impair its availability as evidence in the investigation. As such, a rational trier of fact could have concluded that Patterson, knowing that an official investigation was likely to occur, removed the gun from the murder scene in Hancock County with the purpose of impairing the gun's availability in the

investigation. R.C. 2921.12(A)(1). Since *at least* one element of the offense of tampering with evidence occurred in Hancock County, the trial court did not err by denying Patterson's Crim.R. 29(A) motion for lack of venue. R.C. 2901.12(A), (H).

**{¶76}** Patterson's first, third, and fifth assignments of error are overruled.

### ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT GAVE THE JURY INSTRUCTIONS FOR TRESPASS AND TAMPERING WITH EVIDENCE THAT WERE LEGALLY INCORRECT, AND FAILED TO PROPERLY INSTRUCT THE JURY ABOUT THE LESSER INCLUDED OFFENSE OF RECKLESS HOMICIDE.**

**{¶77}** In his second assignment of error, Patterson argues that the trial court erred by instructing the jury that "the insertion of any part of the body is sufficient to constitute an entrance" for purposes of a trespass for an aggravated burglary. Patterson argues that the facts of this case did not support the jury instruction. Patterson also argues that the trial court erred by instructing the jury on tampering with evidence without any specific intent language. Finally, Patterson argues that the trial court erred by failing to instruct the jury on the lesser included offense of reckless homicide.

**{¶78}** "A trial court's instructions to a jury must correctly, clearly, and completely state the law applicable to the case." *State v. Orians*, 179 Ohio App.3d 701, 2008-Ohio-6185, ¶ 10 (3d Dist.), citing *State v. Thomas*, 170 Ohio App.3d

727, 2007-Ohio-1344, ¶ 15 (2d Dist.). When an appellate court reviews jury instructions, it must examine the specific charge at issue in the context of the entire charge, and not in isolation. *Id.*, citing *State v. Thompson*, 33 Ohio St.3d 1, 13 (1987). Jury instructions are within the trial court's discretion, and therefore, not disturbed on appeal absent an abuse of discretion. *Id.*, citing *State v. Guster*, 66 Ohio St.2d 266, 271 (1981).

{¶79} The trial court did not abuse its discretion by instructing the jury that "the insertion of any part of the body is sufficient to constitute an entrance" for purposes of a trespass. (Feb. 15, 2011 Tr. at 1224). This Court approved of a similar instruction in *State v. Wright*, 3d Dist. No. 5-01-10 (Aug. 24, 2001), and therefore, we find no error here. The evidence in this case supported the instruction notwithstanding Patterson's argument to the contrary. The fact that there was an eyewitness in *Wright* is not dispositive here. The trial court also correctly instructed the jury on the tampering with evidence charge, noting, in relevant part, that the jury must find beyond a reasonable doubt that the defendant "removed a thing with the purpose to remove its value or availability as evidence in the proceeding or investigation." (Feb. 15, 2011 Tr. at 1233). Contrary to Patterson's allegation, the trial court did instruct the jury on the required mental culpability element.

{¶80} Next, Patterson argues that the trial court abused its discretion by failing to instruct on the lesser included offense of reckless homicide. We disagree.

{¶81} Reckless homicide under R.C. 2903.041 is a lesser included offense of an aggravated felony murder under R.C. 2903.01(B). *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, ¶ 190. Nevertheless, a charge on the lesser offense is required "'only where the evidence presented at trial would reasonably support both an acquittal of the crime charged and a conviction upon the lesser included offense.'" *Id.* at ¶ 192, quoting *State v. Thomas*, 40 Ohio St.3d 213 (1988), paragraph two of the syllabus. When deciding whether to instruct the jury on a lesser included offense, the trial court must view the evidence in the light most favorable to the defendant. *Id.*, citing *State v. Campbell*, 69 Ohio St.3d 38, 47-48 (1994). However, a lesser included offense instruction is not required when "'some evidence'" is presented to support the lesser offense; rather, a court must find "'sufficient evidence'" to "'allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense.'" *Id.*, quoting *State v. Shane*, 63 Ohio St.3d 630, 632-633 (1992).

{¶82} The trial court concluded that there was insufficient evidence that Patterson acted recklessly to support a jury instruction on reckless homicide. (Feb. 15, 2011 Tr. at 1132). The trial court did not abuse its discretion in reaching that

conclusion. The fact that Patterson cocked, pointed, and fired his weapon through the apartment door at a height equivalent to Snyder's center of mass, and while knowing that Snyder was directly on the other side of the door, indicates Patterson's specific intent to kill Snyder. Although there was some evidence of Patterson's original intention of simply beating up or "pistol whipping" Snyder, we are not persuaded that there was "'sufficient evidence'" to "'allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense'" in this case. *Trimble* at ¶ 192, quoting *Shane*, 63 Ohio St.3d at 632-633.

{¶83} Patterson's second assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. IX

**THE TRIAL COURT ERRED BY ADMITTING A WITNESS' PRIOR WRITTEN STATEMENT PURSUANT TO EVID.R. 801(D)(1)(B), AND BY PERMITTING VOUCHING.**

{¶84} In his ninth assignment of error, Patterson argues that the trial court erred by admitting Hampton's prior written statement under Evid.R. 801(D)(1)(b). Patterson further argues that Detective Domme was inappropriately permitted to testify that he interviewed Stacey Daniels, who did not testify, and that she provided a complete and accurate statement, which created the inference that Patterson committed the crime. Finally, Patterson alleges that Detective De Graaf inappropriately vouched for Trausch.

{¶85} "[T]he admission or exclusion of relevant evidence rests within the sound discretion of the trial court"; therefore, we review for an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus; *State v. Finnerty*, 45 Ohio St.3d 104, 107 (1989); *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). Additionally, Patterson failed to object to the admission of the prior written statement and to the testimony of Detectives Domme and De Graaf; and therefore, Patterson has waived all but plain error on appeal. *State v. Dixon*, 152 Ohio App.3d 760, 2003-Ohio-2550, ¶ 21 (3d Dist.). To find plain error under Crim.R. 52(B), there must be a deviation from a legal rule, the error must be an "obvious" defect in the trial proceedings, and the error must have affected a defendant's "substantial rights." *Id.*, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Plain error is utilized "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.*, quoting *Barnes*, 94 Ohio St.3d at 27.

{¶86} Patterson argues that Hampton's prior written statement was inadmissible hearsay. We disagree. A prior consistent statement is not hearsay if the declarant testifies at trial concerning the statement subject to cross-examination, and the statement is offered to rebut an express or implied charge of recent fabrication, improper influence, or motive against the declarant. Evid.R. 801(D)(1)(b). Hampton testified that Patterson admitted shooting Snyder. (Feb.

11, 2011 Tr. at 979-992). During cross-examination, defense counsel questioned Hampton concerning his previous oral statement (Defendant's Ex. D) and his previous written statement (Defense Ex. E). (*Id.* at 999-1000). Furthermore, during cross-examination, defense counsel implied that Hampton had an improper motive to make the written statement, i.e. reducing his sentencing in an unrelated case. (*Id.* at 995-1005). Consequently, the admission of Hampton's prior written statement was admissible under Evid.R. 801(D)(1)b). Furthermore, we are not persuaded that the admission of the prior written statement, even if erroneous, would rise to the level of plain error in this case.

{¶87} Patterson next argues that Detectives Domme and De Graaf inappropriately vouched for Stacey Daniels and Nicholas Trausch, respectively. We disagree.

{¶88} "The opinion of a witness as to whether another witness is being truthful is inadmissible." *State v. Huff*, 145 Ohio App.3d 555, 561 (1st Dist. 2001). "'In our system of justice, it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of the witnesses.'" *Id.*, quoting *State v. Eastham*, 39 Ohio St.3d 307, 312 (Brown, J., concurring). Having police officers vouching for witnesses is especially problematic since "'jurors are likely to perceive [them] as expert witnesses, especially when such officers are giving opinions about the present case based

upon their previous experiences with other cases.'" *Id.*, quoting *State v. Miller*, 2nd Dist. No. 18102 (Jan. 26, 2001). However, a police officer is not vouching for a witness' credibility by explaining the investigative procedure he followed, and such testimony is admissible for that purpose. *State v. Monroe*, 8th Dist. No. 94768, 2011-Ohio-3045, ¶ 34.

**{¶89}** Detective Domme testified that he interviewed Stacey Daniels, but he did not testify concerning her credibility, as Patterson alleges. (Tr. at 1020-1022). Domme testified that he did not reveal any specific information about the investigation to Stacey during the interview, which was offered by the State to show that Hampton's only source of information related to the case was Patterson. (*Id.*). Likewise, Detective De Graaf did not testify concerning Trausch's credibility. De Graff testified that, after law enforcement began to theorize that Patterson fired the weapon through the apartment door as Snyder was closing the door, he re-interviewed Trausch, and Trausch's statements during this interview were consistent with this new theory. (*Id.* at 1068-1069). This testimony was properly admitted for the purpose of showing the investigatory process. *Monroe* at ¶ 34. Finally, even if the trial court's admission of Domme and De Graaf's testimony was erroneous, Patterson has failed to demonstrate plain error in this case.

**{¶90}** Patterson's ninth assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. VI

## THE TRIAL COURT ABUSED ITS DISCRETION BY NOT IMPOSING THE SHORTEST SENTENCE AVAILABLE.

{¶91} In his sixth assignment of error, Patterson argues that the trial court abused its discretion by not sentencing him to the shortest available prison term. Specifically, Patterson argues that his sentence was excessive in light of his minimal criminal record, enrollment in college, his community service, and his babysitting of Daniels' children so Daniels could maintain employment. He also maintains that the trial court failed to fully consider the sentencing factors regarding mitigation. We disagree.

{¶92} A trial court's sentence will not be disturbed on appeal absent a defendant's showing by clear and convincing evidence that the sentence is unsupported by the record; the sentencing statutes' procedure was not followed or there was not a sufficient basis for the imposition of a prison term; or that the sentence is contrary to law.[1] *State v. Ramos*, 3d Dist. No. 4-06-24, 2007-Ohio-767, ¶ 23 (the clear and convincing evidence standard of review set forth under R.C. 2953.08(G)(2) remains viable with respect to those cases appealed under the applicable provisions of R.C. 2953.08(A), (B), and (C) * * *); *State v. Rhodes*,

---

[1] This Court notes that the Ohio Supreme Court has released a plurality opinion on the issue of whether a clear and convincing standard or an abuse of discretion standard is proper for reviewing felony sentences under R.C. 2953.08(G). *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912. Although this Court utilized our precedential clear and convincing standard, affirmed and adopted by *Kalish*'s three dissenting Justices, we would have concluded that Patterson's sentence was proper under the *Kalish* plurality's two-step approach as well.

12th Dist. No. CA2005-10-426, 2006-Ohio-2401, ¶ 4; *State v. Tyson*, 3d Dist. Nos. 1-04-38; 1-04-39, 2005-Ohio-1082, ¶ 19, citing R.C. 2953.08(G). Clear and convincing evidence is that "which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus; *State v. Boshko*, 139 Ohio App.3d 827, 835 (12th Dist. 2000). An appellate court should not, however, substitute its judgment for that of the trial court because the trial court is "'clearly in the better position to judge the defendant's likelihood of recidivism and to ascertain the effect of the crimes on the victims.'" *State v. Watkins*, 3d Dist. No. 2-04-08, 2004-Ohio-4809, ¶ 16, quoting *State v. Jones*, 93 Ohio St.3d 391, 400 (2001).

**{¶93}** Patterson does not contend on appeal that the trial court's sentence is contrary to law, and the record demonstrates that the sentence was, in fact, authorized by law. R.C. 2929.03(A)(1)(d); R.C. 2929.14(A)(3); R.C. 2929.14(D)(1)(a)(ii).[2] The record further demonstrates that the trial court considered the applicable sentencing statutes. (Apr. 21, 2011 Tr. at 22); (Apr. 27, 2011 JE, Doc. No. 172). The pre-sentence investigation (PSI) report indicates that Patterson had multiple traffic offenses, a petty theft offense, two disorderly conduct convictions, and a domestic violence charge. (Court's Ex. 1). Patterson

---

[2] Patterson was sentenced on April 21, 2011, so the prior versions of R.C. 2929.14(A)(3) and R.C. 2929.14(D)(1)(a)(ii) (eff. 4-7-09) apply in this case.

was convicted of multiple serious offenses, including aggravated felony murder. Furthermore, the evidence at trial and Patterson's criminal record demonstrate that Patterson is prone to violence, and his violent criminal behavior was committed in the presence of Stacey's minor children and niece. While Patterson's enrollment in college and community service is laudable, they cannot overcome the significant impact his criminal actions have had not only upon the individuals involved but the entire community. Therefore, the trial court did not abuse its discretion by sentencing Patterson to life imprisonment with parole eligibility after 37 years.

{¶94} Patterson's sixth assignment of error is, therefore, overruled.

{¶95} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, J., concurs.**

**/jlr**

**WILLAMOWSKI, J., Concurring Separately.**

{¶96} I concur fully with the judgment of the majority, however write separately to emphasize the appropriate standards of review. The standard of review for sentences was set forth in the plurality opinion of *Kalish*, supra. In

*Kalish*, four panel members noted that R.C. 2953.08(G) requires that appellants must meet a clearly and convincingly contrary to law standard of review when reviewing a sentence.[3] For example, if the sentencing court imposed consecutive sentences, the standard of review would be whether appellant has shown that the sentence was clearly and convincingly contrary to law. However, if the appeal is based upon alleged improper application of the factors in R.C. 2929.12, four panel members in *Kalish* would require review using an abuse of discretion standard as specifically set forth in R.C 2929.12.[4]

{¶97} In his sixth assignment of error, Patterson alleges that the trial court erred by failing to sentence him to the shortest possible sentence under R.C. 2929.14. Patterson's appeal of his felony sentence does not challenge the application of the factors in R.C. 2929.12. Thus, the sole question raised by this assignment of error is whether Patterson proved by clear and convincing evidence that the trial court erred in its sentence. As stated by the majority, the sentence was within the statutory range of sentences and the trial court considered the appropriate factors. For this reason, I concur in the judgment of the majority.

---

[3] Justices Pfeifer, Lundberg Stratton, Lanzinger, and Judge Willamowski, sitting by assignment, all reached this conclusion.

[4] Justices O'Connor, Moyer, O'Donnell, and Judge Willamowski, sitting by assignment, concurred in this position, although the first three would use both standards of review in all cases.