[Cite as *State v. Randle*, 2018-Ohio-207.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

KOREY RANDLE,

    DEFENDANT-APPELLANT.

CASE NO. 9-17-08

**O P I N I O N**

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

KOREY RANDLE,

    DEFENDANT-APPELLANT.

CASE NO. 9-17-09

**O P I N I O N**

Appeal from Marion County Common Pleas Court
Trial Court No. 14-CR-0444 and 16-CR-0596

**Judgments Affirmed**

**Date of Decision: January 22, 2018**

APPEARANCES:

    *Nathan D. Witkin* **for Appellant**

    *Kevin P. Collins* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Korey T. Randle ("Randle") appeals the judgments of the Marion County Court of Common Pleas, alleging (1) that the offenses of aggravated robbery and kidnapping should have merged at sentencing; (2) that the State violated ethical duties in the prosecution of this case; (3) that the trial court erred by overruling his motion for a mistrial after the prosecution requested a recess to "bolster" a State witness's testimony; and (4) that the jury returned a verdict against the manifest weight of the evidence. For the reasons set forth below, the judgments of the lower court are affirmed.

*Facts and Procedural History*

{¶2} At 7:00 in the morning on July 22, 2017, Matthew Thomas ("Thomas") left work and returned to his home on Cherry Street in Marion, Ohio. Trial Tr. 315. At roughly 10:00 that morning, Randle came to Thomas's house for a visit. *Id*. at 317. According to Thomas, he and Randle, at some point that morning, decided to commit a robbery. *Id*. at 322. They got in Thomas's car—which was a maroon Chrysler PT Cruiser with flames decaled on the front—and drove to Randle's house. *Id*. at 322, 354. Thomas testified that they picked up jumpsuits at Randle's house and then drove to Al's Country Market. *Id*. at 322, 324.

{¶3} Once they arrived at Al's Country Market, Thomas parked in the lot in front of the store. *Id*. at 324. Thomas testified that he got out of the car and walked into the front door of the store while Randle walked around the back of the store.

*Id*. at 325. When Thomas entered the store, no one was behind the counter. *Id*. at 148, 326-327. Thomas testified that he then saw Randle walk around the corner with an employee of Al's Country Market—who was Paulette Bullion ("Bullion")—walking in front of him at knife point. *Id*. at 326-327.

{¶4} Thomas testified that he and Randle yelled orders to Bullion. *Id*. at 327. Bullion testified that, at this point, the two men ordered her to put the money from the register into a bag. Id. at 174. Once Bullion had emptied the contents of the cash register and the lottery box into a plastic bag, Thomas told Bullion to go to the back of the store. *Id*. at 349. Randle, holding his knife, walked Bullion to the back of the store where he directed Bullion to go into a closet. *Id*. at 352. Thomas and Randle then pushed a table and chair in front of the door. *Id*. at 352. After the table was secured in front of the door, Thomas grabbed Bullion's purse off of the table, and Randle and Thomas exited the store. *Id*. at 352-353. Shortly after Thomas and Randle left, a customer entered the store. *Id*. at 152. Bullion, from inside the closet, called out to the customer, who let Bullion out of the closet. *Id*. Bullion then called the police. *Id*.

{¶5} Thomas testified that he and Randle then drove out of the parking lot of Al's Country Market and went to the house of Iris Rogers ("Rogers"), who was Randle's cousin. *Id*. at 327, 426. At Rogers's house, Randle gave Thomas his half of the money that they had stolen from Al's Country Market. *Id*. at 332. Thomas stated that he spent this money on cocaine at Rogers's house. *Id*. at 332. From this

location, Thomas began driving back to his house on Cherry Street. *Id*. at 334. Law enforcement had, by this time, identified the maroon PT Cruiser that Thomas drove to Al's Country Market as belonging to Thomas and were searching for Thomas. *Id*. When Thomas drove onto Cherry Street, the police saw his vehicle and apprehended him. *Id*. Thomas did not cooperate with the sheriff's office in this investigation. *Id*. at 338. He did cooperate with the prosecutor's office after a plea agreement had been negotiated. *Id*. at 378. At this point, Thomas implicated Randle in the offenses that were committed in Al's Country Market. *Id*.

{¶6} Randle was indicted on November 17, 2016. Doc. 1. Randle's trial began on February 2, 2017. Trial Tr. 1. At trial, Bullion testified about the incident. *Id*. at 147. On cross examination, she testified about the statement that she gave to the police. *Id*. at 178, 180. The Defense questioned her about a statement she made that indicated that one of the perpetrators sounded as though they had a foreign accent. *Id*. at 180. However, at trial, she explained that the accent sounded like an attempt by the perpetrator to disguise his voice. *Id*. She also stated that the perpetrator sounded clearer as he continued to speak. *Id*.

{¶7} At the beginning of Thomas's direct examination, the prosecutor asked Thomas whether he committed the robbery with another person. *Id*. at 310. In response, Thomas said, "I need a minute." *Id*. At this point, the prosecutor asked the trial judge for a brief recess and said, "I don't want to coach him." *Id*. The trial court ordered a recess of ten minutes over the objection of the Defense. *Id*. at 311.

After the ten-minute recess, the Defense made a motion for a mistrial, arguing that the jury may have been compromised by this "prejudicial occurrence" and that Thomas should have been prepared to testify prior to coming to court on the day of trial. *Id*. at 311. In response the prosecutor said,

> **Your Honor, I don't think it's unusual for an accomplice witness to get cold feet. He's worried about his health and safety. He's worried about the health and safety of his family. I just reminded him that—what he's supposed to be doing here today. He needed to gird his loins for a moment. He's prepared to testify. I don't think a mistrial is necessary. I think that would be the strictest sanction. I don't know that the jury has been compromised at all.**

*Id*. at 312. The trial court then overruled the Defense's motion for a mistrial. *Id.*

{¶8} Thomas then testified as to why he was "reluctant to testify." *Id*. at 314. Thomas explained that, while he was in the county jail, another inmate was attacked. *Id*. Thomas identified the person who had perpetrated this attack. *Id*. at 314-315. Ten months after Thomas testified in that case, he was called a "snitch" by another inmate who struck him in the face with "a lock in a sock." *Id*. at 315-316. The force of this blow caused scarring to his face and broke his jaw. *Id*. at 315. As the result of this prior incident, Thomas expressed concern at trial that he would be labeled a "snitch" and would be attacked again. *Id*. at 316.

{¶9} On cross examination, the Defense discussed several false statements that Thomas had made to the grand jury. *Id*. at 398-407. Thomas admitted that he lied to the grand jury about his involvement in these crimes. *Id*. at 401. On redirect, he testified, however, that he did not lie to the grand jury about Randle's

involvement in these crimes. *Id*. at 410, 424. He also pointed to the fact that his statements about Randle's involvement before the grand jury were consistent with his statements before the trial court. *Id*. The Defense also questioned Thomas about his three prior convictions, several false statements he made to the police, his reluctance to testify at trial about Randle's involvement, and the terms of his plea agreement. *Id*. 385, 386, 394, 409-410.

{¶10} The State also called several witnesses who connected Randle and Thomas to each other on the day of the incident. Kyle J. Hopkins was one of Thomas's neighbors and testified that he saw Randle and Thomas together on the morning of July 22, 2016. *Id*. at 445. Angelo Flores then testified that he saw Randle on Cherry Street shortly after Thomas was arrested and that he gave Randle a ride back to Randle's house. *Id*. at 439, 442. Rogers testified that Randle and Thomas were at her house on July 22, 2016. *Id*. at 427. The prosecution also introduced a recording of a phone call that Thomas made from jail in which he speaks of being with Randle on July 22, 2016. *Id*. at 361. The prosecution also called Peggy Romine ("Romine"), who works at the County Corrections Center, to authenticate documents that showed Randle deposited funds into Thomas's commissary account while Thomas was in jail. *Id*. at 272-273.

{¶11} On February 6, 2017, the jury found Randle guilty of aggravated robbery in violation of R.C. 2911.01(A)(1) and kidnapping in violation of R.C.

2905.01(A)(2).  Doc. 98, 99.  Randle filed his timely notice of appeal on March 31, 2017.  Doc. 127.  On appeal, Randle raises the following four assignments of error:

**First Assignment of Error**

**The offenses of aggravated robbery and kidnapping should have merged in this matter.**

**Second Assignment of Error**

**In this matter, the State violated an ethical duty to reveal that the indictment in this matter was based on perjured testimony, demonstrate [sic] that the perjury had been remedied before proceeding to trial, and reveal [sic] any promises of immunity regarding such perjury.**

**Third Assignment of Error**

**The trial court improperly overruled appellant's motion for a mistrial regarding the State's request for a recess to bolster their witness's testimony.**

**Fourth Assignment of Error**

**The jury's decision to convict the appellant was against the manifest weight of the evidence.**

We will consider these assignments of error in the order in which they were presented in the appellant's brief.

*First Assignment of Error*

{¶12} In his first assignment of error, Randle argues that the offenses of kidnapping and aggravated robbery should have merged upon sentencing because these acts were committed together and there was "not * * * a point in which one offense ends and the other offense begins."  Appellant's Brief, 4.  Specifically, the

-7-

Defense argues that the robbery began when the appellant brandished a weapon in front of the victim and ended when the appellant took the victim's purse and left the store. The Defense contends that the appellant ordered the victim into a locked closet in between the two events that constituted the beginning and end of the robbery. Thus, he claims that these two offenses should merge because the robbery had not ended by the time he committed the crime of kidnapping.

Legal Standard

{¶13} "Both R.C. 2941.25 and the Double Jeopardy Clause prohibit multiple convictions for the same conduct." *State v. Sergent*, 148 Ohio St.3d 94, 2016-Ohio-2696, 69 N.E.3d 627, ¶ 28, quoting *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 27. R.C. 2941.25 reads:

> **(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.**
>
> **(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.**

R.C. 2941.25(A), (B).

{¶14} Under Ohio law, if a defendant is charged with allied offenses—which are multiple crimes committed with the same conduct—the "trial court is required to merge [these offenses] at sentencing." *Sergent* at ¶ 28, quoting *Underwood* at ¶

27.    To determine "whether two offenses are…subject to merger under R.C. 2941.25, the conduct of the accused must be considered."  *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 16, quoting *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, syllabus.

> **However, multiple convictions are permitted 'if we answer affirmatively to just one of the following three questions: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separate?   And (3) Were they committed with a separate animus or motivation?'**

(Citations omitted.)  *State v. Howton*, 3d Dist. Allen No. 1-16-35, 2017-Ohio-4349, ¶ 14, quoting *State v. Bailey*, 1st Dist. Hamilton No. C-140129, 2015-Ohio-2997, ¶76, citing *Ruff* at paragraph three of the syllabus.

{¶15} "If the offenses are committed with the same conduct but with a separate animus, multiple convictions can be sustained."  *State v. Brentlinger*, 2017-Ohio-2588, --- N.E.3d ---, ¶ 28 (3d Dist.), citing *State v. Hadding*, 3d Dist. Auglaize No. 2-12-14, 2013-Ohio-643, ¶ 14.   "The Supreme Court of Ohio has defined animus as "purpose, or more properly, immediate motive."  *Brentlinger* at ¶ 28, quoting *State v. Logan*, 60 Ohio St.2d 126, 131, 397 N.E.2d 1345 (1979).  "Whether offenses are allied offenses of similar import is a question of law that this court reviews de novo."  *State v. Potts*, 3d Dist. Hancock No. 5-16-03, 2016-Ohio-5555, ¶ 93, citing *State v. Stall*, 3d Dist. Crawford No. 3-10-12, 2011-Ohio-5733, ¶ 36.

Legal Analysis

{¶16} In this case, the offenses of robbery and kidnapping were each committed with a separate animus.[1] The crime of robbery often involves the crime of kidnapping. *State v. Jenkins*, 15 Ohio St.3d 164, 198, 473 N.E.2d 264 (1984), fn. 29. As Randle was leading Bullion towards the front of the store at knife point, he was kidnapping her for the purpose of facilitating a robbery. At this point, the two offenses were committed pursuant to the same animus: Randle's intent to perpetrate a robbery motivated him to commit the offense of kidnapping. However, after Bullion had emptied the contents of the cash register and the lottery box into the bag, Randle ordered Bullion into the back room where he locked her in a closet.

{¶17} While walking Bullion to the front of the store at knife point was incidental to the crime of robbery, walking her to the back of the store at knife point and then locking her in a closet was not a part of facilitating the robbery. The offense that was committed when Randle locked Bullion in a closet was not necessary to further the robbery and was not incidental to the commission of the robbery. Rather, this separate series of actions was undertaken for the purpose of facilitating Randle's escape. His intent to commit a robbery was no longer what animated his actions. At the time the robbery was completed, his "immediate

---

[1] Under *Ruff*, "offenses do not merge unless they involve (1) the 'same conduct,' (2) a 'similar import,' and (3) a single 'animus.'" *Ruff* at ¶ 38. Thus, the Defense's argument fails if any one of these three factors is absent in this case. Since we find that the facts of this case clearly demonstrate that the offense of kidnapping was committed with a separate animus from the offense of robbery, we will limit our analysis to determining whether these offenses had separate motivations, and we will not analyze the facts of this case to determine whether the other two factors are present.

-10-

motive" changed: he was now motivated by a desire to evade apprehension. Locking Bullion in a closet prevented her from notifying the authorities and gave him more time to escape. Since a different animus motivated each of these offenses, the crime of kidnapping in violation of R.C. 2905.01(A)(2) was committed in addition to the crime of robbery. These crimes are not, therefore, allied offenses subject to merger. For these reasons, Randle's first assignment of error is overruled.

*Second Assignment of Error*

{¶18} In his second assignment of error, Randle argues that the State violated several ethical duties while prosecuting this case. First, the Defense alleges that the State used testimony that contained perjury to secure an indictment against the appellant. Second, the Defense claims that the State did not disclose the fact that the grand jury heard testimony that contained perjury, which, according to the Defense, was evidence that was favorable to the defendant under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1972). Third, the Defense suggests that the State may have granted immunity to one of the key witnesses against Randle without disclosing this fact. We will address each of these arguments in turn.

Legal Standard for the Perjury Issue

{¶19} R.C. 2921.11 defines the offense of perjury and reads, in its relevant part, as follows:

**(A) No person, in any official proceeding, shall knowingly make a false statement under oath or affirmation, or knowingly swear or affirm the truth of a false statement previously made, when either statement is material.**

**(B) A falsification is material, regardless of its admissibility in evidence, if it can affect the course or outcome of the proceeding. It is no defense to a charge under this section that the offender mistakenly believed a falsification to be immaterial.**

"Based upon the plain language of R.C. 2929.11(B), a false statement is material if it *can* affect the outcome of a proceeding. R.C. 2929.11(B) does not require that the outcome actually be affected." (Emphasis sic.) *State v. Douglas*, 3d Dist. Marion No. 9-05-24, 2005-Ohio-6304, ¶ 14.

Legal Analysis for the Perjury Issue

**{¶20}** Randle's first argument alleges that the prosecution based its indictment on perjured testimony from Thomas. While the Defense cross examined Thomas, defense counsel introduced the false statements that Thomas made to the grand jury. Further, Thomas admitted at trial that he had lied to the grand jury in making these statements. However, these false statements did not constitute perjury as these were not material statements. *See State v. Widmer*, 12th Dist. Warren No. CA2012-02-008, 2013-Ohio-62, ¶ 41, quoting *Monroe v. Smith*, 197 F.Supp.2d 753, 762 (E.D.Mich.2001) (holding "the fact 'that a witness contradicts [himself] or changes [his] story also does not establish perjury.'"). The grand jury was convened to determine whether an indictment should be issued against Randle. Thus, in this

-12-

context, a false statement would have had to have been able to affect the decision as to whether an indictment should be issued against Randle in order to be material.

**{¶21}** The false statements that Thomas made did not address Randle's activities in the matter before the grand jury. Rather, the false statements that Thomas made to the grand jury addressed his involvement in this crime and marginalized his role in committing this offense. The statements that Thomas made to the grand jury about Randle's criminal activities were consistent with the statements that he made about Randle at trial. In the absence of these false statements, the indictment would not have been based on insufficient evidence. *See State v. Cruise*, 4th Dist. Washington No. 85-CA-28, 1987 WL 7009, \*4 (Feb. 24, 1987),[2] citing 2 La Fave Criminal Procedure 312 Sec. 15. Since the grand jury was considering whether to indict Randle, these particular false statements could not have had an effect on the outcome of the proceeding because the false statements did not address Randle's activities. *Compare State v. Wimbush*, 5th Dist. Richland No. 2005CA0024, 2005-Ohio-6436, ¶ 15. Thus, the prosecution did not violate an ethical duty in this regard as alleged by Randle.

Legal Standard for the *Brady* Violation Issue

---

[2] In *Cruise*, the Court held, "No Ohio cases have been cited and we are unaware of any which authorizes dismissal of an indictment because perjured testimony was presented to the grand jury." *Cruise* at \*4. Similarly, in this case, appellant does not cite any Ohio law. Rather, appellant argues that the indictment should have been dismissed as this is the practice in federal court. Since we have determined that the indictment was not based upon perjured testimony, we need not address the argument that this Court should follow the practices of federal courts.

{¶22} A *Brady* violation occurs "[w]hen the prosecution withholds material, exculpatory evidence in a criminal proceeding * * *." *State v. Johnston*, 39 Ohio St.3d 48, 60, 529 N.E.2d 898 (1988). *See Brady, supra,* at 86-87. Specifically, "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady, supra,* at 87.

> **[I]n determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."**

*Johnston* at 61, quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The defendant has the burden to prove a *Brady* violation rising to the level of a due-process violation." *State v. Pickens*, 141 Ohio St.3d 462, 2014-Ohio-5445, 25 N.E.3d 1023, ¶ 102.

Legal Analysis for the *Brady* Violation Issue

**{¶23}** In his second argument under this assignment of error, Randle alleges that the prosecution committed a *Brady* violation by failing to disclose the perjured statements made by Thomas to the grand jury. The Defense, however, did not carry the burden of establishing that a due process violation occurred because the Defense cannot demonstrate that there is a reasonable probability that the outcome would have been different had the Defense received these statements in a different manner. *See Johnston* at 61.

**{¶24}** By the time of trial, the Defense had the false statements that Thomas made to the grand jury in their possession and had time to review these statements before Thomas testified. *See State v. Iacona*, 93 Ohio St.3d 83, 100, 752 N.E.2d 937 (2001), citing *State v. Wickline*, 50 Ohio St.3d 114, 116, 552 N.E.2d 913, 917 (1990). Further, the Defense was able to introduce these false statements on cross examination while Thomas was testifying. Since the Defense had these statements by the time of trial and introduced them on cross examination, Randle cannot establish a due process violation in this case because the Defense did not show how the manner in which the Defense received these statements would have affected the outcome of the case.

Legal Standard for Alleged Promise of Immunity Issue

**{¶25}** "App.R. 9(A)(1) limits the record on appeal to '[t]he original papers and exhibits thereto filed in the trial court, the transcript of the proceedings, if any,

-15-

including exhibits, and a certified copy of the docket and journal entries prepared by the clerk of the trial court * * *.'" *State v. White*, 3d Dist. Seneca No. 13-14-29, 2015-Ohio-817, ¶ 16, quoting App.R. 9(A)(1). *See State v. Snyder*, 3d Dist. Seneca No. 13-12-38, 2013-Ohio-2046, ¶ 16. "Since a reviewing court can only reverse the judgment of a trial court if it finds error in the proceedings of such court, it follows that a reviewing court should be limited to what transpired in the trial court as reflected by the record made of the proceedings." *State v. Ishmail*, 54 Ohio St.2d 402, 405-406, 377 N.E.2d 500, 502 (1978). "A reviewing court cannot add matter to the record before it, which was not a part of the trial court's proceedings, and then decide the appeal on the basis of the new matter." *Id*. at syllabus.

Legal Analysis for Alleged Promise of Immunity Issue

{¶26} In this argument, the Defense alleges that the prosecution may have given Thomas a promise of immunity in exchange for his testimony at trial and failed to disclose this alleged immunity agreement. However, no evidence in the record suggests a promise of immunity was extended to Thomas. On direct appeal, our review of the trial court's determinations is limited to the contents of the record. The Defense did not present any information at trial that would substantiate this claim, making this argument purely speculative.

{¶27} Under this assignment of error, Randle advanced three arguments that purportedly supported the assertion that the State violated various ethical duties in this prosecution of this case. However, after examining these three arguments, we

do not find evidence that the State violated its ethical duties as alleged by appellant. For this reason, Randle's second assignment of error is overruled.

*Third Assignment of Error*

{¶28} In his third assignment of error, Randle asserts that trial court erred by failing to grant his motion for a mistrial after the State asked for a recess to speak with one of its witnesses. Randle claims that the State requested this recess "for the specific purpose of affecting [a] witness's testimony." Appellant's Brief, 8. While the State explicitly stated that it was not going to coach Thomas, Randle alleges that the recess "seemed to be aimed at talking to the witness about how he should testify." *Id*. Randle contends that this practice violated his due process rights, his right to a fair trial, and his right to confrontation.

Legal Standard

{¶29} "The grant or denial of a mistrial lies within the sound discretion of the trial court. However, a trial court need not declare a mistrial unless 'the ends of justice so require and a fair trial is no longer possible.'" *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, ¶ 173, quoting *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). Thus, a trial court's decision to deny a motion for a mistrial will not be reversed absent an abuse of discretion. *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623, 634 (1995). "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Ortega*, 3d

-17-

Dist. Hancock No. 5-16-17, 2017-Ohio-239, ¶ 10, quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144, 149 (1980). "When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court." *State v. Thompson*, 2017-Ohio-792, 85 N.E.3d 1108, ¶ 11, quoting *In re Jane Doe 1*, 57 Ohio St.3d 135, 138, 566 N.E.2d 1181 (1991).

Legal Analysis

**{¶30}** In this argument, the appellant asserts that the trial court should have declared a mistrial after the prosecution requested a recess to speak with Thomas, alleging that the State coached Thomas during the recess. First, we note that the trial was an adversarial proceeding in "which the defense counsel was free to explore upon examination any coaching or preparation of the [S]tate's witnesses." *State v. King*, 3d Dist. Seneca No. 13-01-20, 2002 WL 479159, \*3 (March 29, 2002).

> **The opposing counsel in the adversary system is not without weapons to cope with 'coached' witnesses. A prosecutor may cross-examine a defendant as to the extent of any 'coaching'** *during a recess*, **subject, of course, to the control of the court. Skillful cross-examination could develop a record which the prosecutor in closing argument might well exploit by raising questions as to the defendant's credibility,** *if* **it had developed that defense counsel had in fact coached the witness as to how to respond on the remaining direct examination and on cross-examination.**

(Emphasis added.) *King* at \*3-4, quoting *Geders v. United States*, 425 U.S. 80, 89-90, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976).

**{¶31}** Second, the record does not suggest that Thomas was coached during the recess. *See State v. Patterson*, 5th Dist. Stark No. 2012CA00098, 2013-Ohio-1647, ¶ 51-52. On cross examination, the Defense questioned Thomas about the terms of his plea agreement and his reluctance to testify. Trial Tr. 409-410. In this process, the Defense questioned Thomas about whether his plea agreement was discussed during the recess, but the Defense did not ask questions inquiring into whether Thomas was coached during the recess. *Id.* For this reason, there is no evidence in the record that suggests that Thomas was coached during the recess. While the Defense alleges on appeal that the purpose of the recess was to coach Thomas, this assertion is speculative as no facts in the record support this claim. On direct appeal, our review is limited to matters in the record. *State v. Martin*, 3d Dist. Putnam No. 12-02-01, 2003-Ohio-735, ¶ 53. We cannot reverse a trial court on the basis of speculation about matters outside of the record. *Id.*

**{¶32}** Third, we note that the trial court is given "control [of] all proceedings during a criminal trial * * *." R.C. 2945.03. The trial judge had the discretion to order a recess to ensure that the trial unfolded in an orderly process. *State v. Heiberger*, 6th Dist. Erie No. E-84-54, 1985 WL 7544, *2 (July 19, 1985). We do not find evidence in the record that suggests the trial court abused this discretion in ordering the recess or in denying Randle's motion for a mistrial. For these reasons, Randle's third assignment of error is overruled.

*Fourth Assignment of Error*

-19-

**{¶33}** In his fourth assignment of error, Randle asserts that the verdict in this case was against the manifest weight of the evidence.  In support of this contention, he points to the testimony of several of the State's witnesses.  Much of this argument focuses on Thomas's credibility as a witness and on one alleged inconsistency in Bullion's testimony.  Based on these "holes" in the State's case, he argues that his conviction was against the manifest weight of the evidence and should, therefore, be reversed.

Legal Standard

**{¶34}** "In a manifest weight analysis, 'the appellate court sits as a 'thirteenth juror' * * *.'" *State v. Davis*, 3d Dist. Seneca No. 13-16-30, 2017-Ohio-2916, ¶ 17, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

> **On appeal, courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"**

*Brentlinger, supra,* at ¶ 36, quoting *Thompkins* at 387. "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 3d Dist. Hancock No. 5-17-09, 2017-Ohio-8937, ¶ 38, quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, 2014 WL 6725795, ¶ 7.  "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,'

should an appellate court overturn the trial court's judgment." *State v. Haller*, 2012-Ohio-5233, 982 N.E.2d 111, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Analysis

**{¶35}** The State, at trial, introduced a security camera recording that showed two men robbing Al's Country Market and kidnapping Bullion. Ex. 1. The State also called Bullion to testify about the robbery and the kidnapping. Trial Tr. 149-167. Thomas's testimony, however, is what identified Randle as one of the two men who perpetrated the offenses in the store. *Id*. at 322, 325. Thomas's testimony also provided evidence that substantiated each of the essential elements of aggravated robbery and kidnapping. *Id*. at 322-323, 327, 349-351. Several other witnesses were able to connect Randle to Thomas on the day of the incident and were, thus, able to corroborate aspects of Thomas's account. Hopkins testified that he saw Randle and Thomas together before the incident at Al's Country Market. *Id*. at 445. Flores testified that he saw Randle on the day of the incident at the location on Cherry Street where Thomas was arrested. *Id*. at 438, 442. Rogers testified that Randle and Thomas were at her house on the day of the incident, which corresponded to Thomas's account of what transpired on July 22, 2016. *Id*. at 427. Finally, Romine testified that Randle deposited funds into Thomas's commissary account while Thomas was in jail. *Id*. at 271-272.

{¶36} The Defense, while cross examining Thomas, introduced the false statements that Thomas had made to the grand jury. *Id*. at 398-407. These statements showed that Thomas's description of his involvement in this crime at trial and his description of his involvement in this crime to the grand jury were inconsistent. *Id*. Thomas admitted that he had lied to the grand jury and to the police immediately after his arrest. *Id*. at 338, 368. Further, Thomas also admitted that he had a conviction for domestic violence, a conviction for possession of heroin, and a conviction for obstruction of justice. *Id*. at 383. Finally, the Defense questioned Thomas about his reluctance to testify and the terms of his plea agreement. *Id*. at 386-394, 409-410. Similarly, the Defense, while cross examining Bullion, questioned her about whether one of the perpetrators had a foreign accent. *Id*. at 180. In response, Bullion explained that she told the police that the man sounded as though he was trying to disguise his voice with an accent and that he got easier to understand as he spoke. *Id*. at 178, 180.

{¶37} After reviewing all of the evidence in the record, we do not find that that the verdict was against the manifest weight of the evidence. The jurors, as the finders of fact in this case, could have reasonably found that Thomas's testimony provided an accurate account of Randle's actions on July 22, 2016. Similarly, the jurors could have accepted the explanation that Bullion provided for the alleged contradiction between her statement to the police and her testimony at trial. After

examining the record, we do not find evidence in the record that the jury lost its way. For these reasons, Randle's fourth assignment of error is overruled.

*Conclusion*

**{¶38}** This Court has found no error prejudicial to the appellant in the particulars assigned and argued in appellate case number 9-17-08. In appellate case 9-17-09, Randle was sentenced for violation of the terms of his community control due to the conviction in appellate case 9-17-08. As his assignments of error in appellate case 9-17-08 have been overruled, the trial court did not err in revoking his community control in appellate case number 9-17-09. For these reasons, the judgments of the Marion County Court of Common Pleas are affirmed.

***Judgments Affirmed***

**SHAW and PRESTON, J.J., concur.**

**/hls**