**[Cite as *State v. Brown*, 2024-Ohio-627.]**

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HENRY COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

KENNETH BROWN,

    DEFENDANT-APPELLANT.

CASE NO. 7-23-05

**O P I N I O N**

---

**Appeal from Henry County Common Pleas Court**
**Trial Court No. 21 CR 0163**

**Judgment Affirmed**

**Date of Decision:  February 20, 2024**

---

**APPEARANCES:**

    *Stephen P. Hardwick* **for Appellant**

    *Gwen Howe-Gebers* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Kenneth Brown ("Brown") appeals the judgment of the Henry County Court of Common Pleas, alleging that his conviction for engaging in a pattern of corrupt activity is not supported by sufficient evidence and that the finding of venue is against the manifest weight of the evidence. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} Special Agent Brad Doolittle ("Agent Doolittle") is assigned to a Drug Enforcement Agency task force that conducts investigations in northwestern Ohio. In March of 2019, a confidential source gave information to the task force that indicated the 800 block of Tecumseh Street in Toledo, Ohio was functioning as a center of various drug-related activities. In response, the task force began an investigation into what was believed to be a "drug trafficking organization" that was operating out of this location. (Tr. 133).

{¶3} The confidential informant who had notified the task force of the drug activity on Tecumseh Street also identified Alexandria Armijo ("Armijo") as "a distributor of cocaine * * *." (Tr. 134). The task force then organized a controlled buy in which the confidential informant purchased cocaine from Armijo at her house in Toledo, Ohio. After this controlled buy, the confidential informant moved to Napoleon, Ohio in Henry County.

{¶4} The task force then sought to arrange another controlled buy. During this process, Armijo "offered to deliver cocaine to the confidential [informant] * * * in Napoleon" so that he would not have to drive to Toledo. (Tr. 135). The task force observed Armijo drive to Tecumseh Street where she obtained cocaine from Anthony Lawrence ("Anthony"). She then drove to Napoleon where she sold the cocaine to the confidential informant in the parking lot of a local plaza.

{¶5} After the third controlled buy in Napoleon, the task force agents stopped Armijo's vehicle.[1] At this time, she reported that "every time that she had brought the cocaine out * * * to Henry County, she received it from Anthony and at the 800 block of Tecumseh" Street. (Tr. 137). She also indicated that she "gets it [the drugs] on the front," meaning that she did not pay Anthony when she obtained the cocaine from him. (Tr. 137). Rather, under this arrangement, she paid him for the cocaine after she sold the drugs with the funds she obtained from her buyer in Henry County.

{¶6} At the time of the traffic stop, Armijo agreed to cooperate with law enforcement. The officers then issued Armijo confidential funds for her to use to repay Anthony for the cocaine that he had fronted her. Armijo returned to Toledo where she met Anthony and gave him $1,550.00 for the drugs that she had sold in Henry County. She then participated in "two or three" more controlled buys in coordination with law enforcement. (Tr. 260).

---

[1] There were a total of four controlled buys between the confidential informant and Armijo, but the first controlled buy occurred in Lucas County. The remaining three occurred in Henry County.

{¶7} The task force continued to investigate the drug trafficking activities on the 800 block of Tecumseh Street and to identify the people involved in this operation. This investigation came to focus on three houses located at 807, 808, and 827 Tecumseh Street that were owned by Anthony or members of his family. Agent Doolittle testified that the "three primary people that were involved in this organization" were "Anthony, Kenneth [Brown,] and Michael [Lawrence ("Michael").]" (Tr. 195). Michael and Anthony were brothers, and Brown was their uncle.

{¶8} While conducting surveillance, law enforcement observed a number of hand-to-hand transactions that occurred in the vicinity of three houses on the 800 block of Tecumseh Street. Calling this area "an open air drug market," Agent Doolittle described what transpired on a typical day at this location as follows:

> Mr. Brown and Michael Lawrence, they ran and operated this 808 Tecumseh Street as if going to work, often getting there in the mornings, 8 or 9 o'clock in the morning, they would stay there, actually come and go throughout the day but sell drugs from there for the day, ending their shift anywhere from 7:00 p.m. until 10:00 p.m. at night, they shut up shop and go to their primary residences.

(Tr. 145). Law enforcement recorded video footage of numerous exchanges involving Brown, Michael, or Anthony and their customers.

{¶9} During these transactions, a vehicle would drive up to the house on Tecumseh Street; a person from the house—Brown, Anthony, or Michael—would make contact with the occupant of the vehicle; Brown, Anthony, or Michael would

then go to a location where the illegal drugs were stashed before returning to the vehicle; and the vehicle would then drive away from the premises. On at least one occasion, the task force was able to record Brown at this location while he was armed and carrying "a stack of cash." (Tr. 398).

{¶10} Agent Doolittle testified that they were able to determine the uses of the three houses on the 800 block of Tecumseh Street during their investigation:

> 808 was identified as a primary distribution point so the customers would come visit 808, get their drugs and leave. 828 * * * and 807 across the street were identified as stash locations where they would keep extra drugs and get what they need. Customers would come to 808 regularly, they would not go to 828, it was mainly the Lawrences or Mr. Brown that would visit 828 and 807.

(Tr. 146). The task force was able to record Brown accessing drugs from a stash point on the outside of one of these houses.

{¶11} Further, James Long ("Long"), who had bought drugs from Brown, provided information to the Drug Enforcement Agency. Long testified that, over a period of roughly three years, he routinely purchased cocaine from Anthony, Michael, and Brown at a house on Tecumseh Street. He stated that he would give money or perform services in exchange for these illegal drugs. Long indicated that Brown would often retrieve drugs from various stashes around the house or in the backyard during these transactions.

{¶12} Law enforcement also examined various social media postings that were made by Brown, Anthony, and Michael. A number of these posts contained

the acronym "TSG." Sergeant Mel Statura ("Sergeant Statura") works on the gang task force at the Toledo Police Department and testified that "TSG" stood for the "Tecumseh Street Gang." (Tr. 370). He testified that the "TSG" drug trafficking operation on the 800 block of Tecumseh Street was connected to the Southside Gangster Disciples in Toledo.

{¶13} Agent Doolittle testified that Toledo would function as a "hub" for drug trafficking, serving as the source of illegal drugs for surrounding communities. As "a street level drug trafficking organization" in Toledo, the Tecumseh Street Gang "ha[d] an entire block" and, for this reason, could be "secure[]" in its activities. (Tr. 434). As part of this organization, Brown "manufactured crack cocaine" and "provided security" in addition to selling drugs. (Tr. 435).

{¶14} On July 21, 2021, law enforcement executed a warrant for 807, 808, and 828 Tecumseh Street in addition to Brown, Anthony, and Michael's primary residences at other nearby locations. A stash of fentanyl was located in the house at 828 Tecumseh Street. The police discovered cocaine inside of Brown's residence in addition to items that are associated with manufacturing crack cocaine. Agent Doolittle noted that "the one location" where the police "found material showing and revealing [the] cooking process of cocaine to crack cocaine was at Mr. Brown[']s residence." (Tr. 195).

{¶15} On November 24, 2021, Brown was indicted on one count of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1), a first-degree

felony. A jury trial was held on this charge from January 9 to January 12, 2023 in Henry County, Ohio. At trial, the Defense made and renewed a Crim.R. 29 motion, arguing that the State had failed to establish venue. However, the trial court denied these motions. The jury was presented with twelve incidents that formed the alleged pattern of corrupt activity. These incidents involved drug trafficking and drug possession. The jury then returned a verdict of guilty on the charge against Brown. On February 21, 2023, the trial court issued its judgment entry of sentencing.

{¶16} Brown filed his notice of appeal on March 23, 2023. On appeal, he raises the following two assignments of error:

**First Assignment of Error**

**The evidence was insufficient to show that Kenneth Brown was part of an 'enterprise' that engaged in a pattern of corrupt activities in Henry County, Ohio. R.C. 2901.12 and 2923.32; Article I, Section 10 of the Ohio Constitution; T.P. 477-484, 523.**

**Second Assignment of Error**

**The finding of venue was against the manifest weight of the evidence because all actions in Henry County were not part of an enterprise to which Kenneth Brown belonged. R.C. 2901.12 and 2923.32; Article I, Section 10 of the Ohio Constitution; T.P. 477-478, 523.**

*First Assignment of Error*

{¶17} Brown asserts that the State did not produce evidence that was sufficient to establish venue. Specifically, he argues that the State failed to demonstrate he was part of an enterprise that conducted activities in Henry County.

-7-

Standard of Review

{¶18} The sufficiency-of-the-evidence analysis examines whether the State has carried its burden of production at trial. *State v. Morris*, 3d Dist. Hardin No. 6-23-04, 2023-Ohio-4021, ¶ 10. A challenge to the sufficiency of the evidence asserts that the State failed to present evidence that could legally support a verdict. *State v. Barga*, 3d Dist. Shelby No. 17-17-14, 2018-Ohio-2804, ¶ 8. Thus, an appellate court is not to decide whether the evidence presented at trial should be believed but should "rather * * * decide whether, if believed, the evidence can sustain the verdict as a matter of law." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13. The applicable standard on appeal "is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have concluded that the essential elements of the crime were proven beyond a reasonable doubt." *State v. Plott*, 2017-Ohio-38, 80 N.E.3d 1008, ¶ 62 (3d Dist.).

Legal Standard

{¶19} R.C. 2923.32 contains Ohio's Racketeer Influenced and Corrupt Organizations ("RICO") statute. To establish the offense of engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1), the State must prove that the defendant was "[1] employed by, or associated with, any enterprise" and "[2] conduct[ed] or participate[d] in, directly or indirectly, the affairs of the enterprise [3] through a pattern of corrupt activity * * *." R.C. 2923.31(C) defines "enterprise"

as including "any organization, association, or group of persons associated in fact although not a legal entity. 'Enterprise' includes illicit as well as licit enterprises."

**{¶20}** "An association-in-fact enterprise has been defined as 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *State v. Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, 37 N.E.3d 116, ¶ 9, quoting *U.S. v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

> an association-in-fact enterprise need not have a formal structure, but must have at least the following features: 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'

*State v. Dent*, 163 Ohio St.3d 390, 2020-Ohio-6670, 170 N.E.3d 816, ¶ 19, quoting *Boyle v. United States*, 556 U.S. 938, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009).

**{¶21}** R.C. 2923.31(E) defines a "pattern of corrupt activity" as "two or more incidents of corrupt activity * * * that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." Under R.C. 2923.31(I)(2)(c), "corrupt activity" includes "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in * * * [c]onduct" that constitutes drug trafficking offenses under 2925.03 and drug possession offenses that are first, second, third, or fourth-degree felonies under R.C. 2925.11.

{¶22} The intent behind R.C. 2923.32 is "to criminalize the pattern of criminal activity, not the underlying predicate acts." *State v. Thomas*, 3d Dist. Allen Nos. 1-11-25, 1-11-26, 2012-Ohio-5577, ¶ 61, quoting *State v. Dodson*, 12th Dist. Butler No. CA2010-08-191, 2011-Ohio-6222, ¶ 68. RICO statutes also exist to provide "enhanced sanctions * * * to deal with the unlawful activities of those engaged in organized crime." *State v. Miranda*, 138 Ohio St.3d 184, 2014-Ohio-451, 5 N.E.3d 603, ¶ 14, quoting the Organized Crime Control Act of 1970, Statement of Findings and Purpose, 84 Stat. 922. Thus, "[t]he RICO statute was designed to impose cumulative liability for the criminal enterprise." *State v. Schlosser*, 79 Ohio St.3d 329, 335, 1998-Ohio-716, 681 N.E.2d 911 (1998).

{¶23} Further, venue "refers to the appropriate place of trial for a criminal prosecution within a state." *State v. Stone*, 12th Dist. Warren No. CA2007-11-132, 2008-Ohio-5671, ¶ 16. "Although venue is not a material element of any criminal offense, it must nevertheless be proven at trial beyond a reasonable doubt, unless waived." *State v. Patterson*, 3d Dist. Hancock No. 5-11-15, 2012-Ohio-2839, ¶ 73. However, venue need not "be proven in express terms" as long as it can "be established by all the facts and circumstances in the case * * *." *State v. Brentlinger*, 2017-Ohio-2588, 90 N.E.3d 200, ¶ 57 (3d Dist.), quoting *State v. Dickerson*, 77 Ohio St. 34, 82 N.E. 969 (1907), at the syllabus.

**{¶24}** "Ohio's criminal venue statute, R.C. 2901.12(H), is broad." *State v. Yavorcik*, 2018-Ohio-1824, 113 N.E.3d 100, ¶ 110 (8th Dist.). This provision reads, in its relevant part, as follows:

(H) When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:

(1) The offenses involved the same victim, or victims of the same type or from the same group.

(2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.

(3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.

(4) The offenses were committed in furtherance of the same conspiracy.

(5) The offenses involved the same or a similar modus operandi.

(6) The offenses were committed along the offender's line of travel in this state, regardless of the offender's point of origin or destination.

R.C. 2901.12. The question of proper venue is ultimately resolved by determining whether the defendant had a "significant nexus" with the jurisdiction in which he was tried. *State v. Carpenter*, 2019-Ohio-58, 128 N.E.3d 857, ¶ 89 (3d Dist.).

{¶25} Since R.C. 2923.32 was "loosely patterned after the Federal RICO legislation," the resolution of venue issues in federal RICO cases can provide useful guidance. *State v. Giffin*, 62 Ohio App.3d 396, 401, 575 N.E.2d 887 (10th Dist.).

> The Ohio statute, like its federal counterpart, was designed to cast a broad net over those who conduct organized criminal activities spanning a number of jurisdictions. * * * Under federal law, substantive RICO violations are properly tried in any district where the 'enterprise' conducted business. * * * Drawing an analogy to conspiracy prosecutions, federal courts have found it immaterial that an individual defendant was not physically present in the [jurisdiction] so long as it can be established that the defendant participated in an enterprise that conducted illegal activities in that [jurisdiction]. * * *.

(Citations omitted.) *Id.* Thus, pursuant to R.C. 2901.12(H),

> a prosecution for engaging in a pattern of corrupt activity in violation of R.C. 2923.32(A)(1) is properly venued in any county in which a portion of the corrupt activity occurred or in which an organization formed for the purpose of engaging in corrupt activity is based.

*State v. Kozic*, 7th Dist. Mahoning No. 11 MA 135, 2014-Ohio-3807, ¶ 98, quoting *State v. Haddix*, 93 Ohio App.3d 470, 479, 638 N.E.2d 1096 (12th Dist. 1994). *See also State v. Woods*, 1st Dist. Hamilton No. C-950954, 1997 WL 602963, *8 (Sept. 5, 1997).

Legal Analysis

{¶26} Brown begins by arguing that he was not in an enterprise with Anthony or Michael. However, the State produced evidence that Brown was involved in a local drug trafficking organization that was known as the Tecumseh Street Gang and that was connected to the Southside Gangster Disciples. On social

media, Brown referred to himself as "Kenneth Stashboy Brown." (Tr. 369). Sergeant Stachura testified that, in the Southside Gangster Disciples, the name "Stashboy represents that you're active in drug trafficking." (Tr. 369). Agent John Dreskler ("Agent Dreskler") of the Drug Enforcement Agency testified that, based on his examination of the online postings of these individuals, this particular association appeared to have begun as early as 2013 or 2016.

{¶27} The trial testimony indicates that Brown participated in this operation by manufacturing crack cocaine, assisting in the distribution of drugs from the houses on the 800 block of Tecumseh Street, and providing security. Agent Doolittle testified that, based on the surveillance conducted on the 800 block of Tecumseh Street, the primary members of this local drug trafficking organization were Anthony, Michael, and Brown.

{¶28} Agent Doolittle further testified that he observed these individuals routinely engage in hand-to-hand transactions with people who came to the 800 block. Brown was seen engaging in these types of transactions multiple times a day. Agent Doolittle described Brown as working a "shift," arriving on Tecumseh Street in the morning and leaving in the evening. (Tr. 145). Throughout the day, buyers "would come visit * * *, get their drugs and leave." (Tr. 146). Video footage of these transactions was introduced by the State at trial.

{¶29} Long's trial testimony indicated that he purchased drugs from the 800 block of Tecumseh Street over a three-year period of time, purchasing $50.00 to

$60.00 of cocaine a week. His testimony indicates that he would go to Tecumseh Street to purchase drugs variously from Michael, Anthony, or Brown, depending on who was available. During these transactions, Michael, Anthony, or Brown would access the stashes of illegal drugs and take payment from Long.

{¶30} This operation appears to have been primarily conducted out of the houses at 807, 808, and 828 Tecumseh Street rather than the personal residences of Brown, Michael, or Anthony. While the house at 808 Tecumseh Street was the "distribution point" where buyers would obtain their drugs, the houses at 807 and 828 were "stash locations where they would keep extra drugs." (Tr. 146). Brown, Anthony, and Michael would regularly access these "stash locations," suggesting that they had a common store of illegal drugs. From the evidence produced by the State at trial, a reasonable finder of fact could find that Brown was involved in an enterprise with Anthony and Michael.

{¶31} Further, the trial testimony from Agent Doolittle and Armijo indicates that the activity of this enterprise eventually reached into Henry County. This process began when Armijo offered to sell illegal drugs to one of her buyers in Henry County after he had moved to Napoleon. Armijo's testimony indicates that she obtained cocaine from the enterprise on Tecumseh Street, travelled into Henry County, and sold the drugs to her buyer in Napoleon, Ohio.

{¶32} Over time, Armijo purchased larger amounts of cocaine to distribute to her buyer in Henry County. On at least one occasion, Armijo indicated that she

sought to obtain one and a half ounces of cocaine from the enterprise at a cost of $1,550.00. Because she did not have the funds to finance this purchase, Armijo was "fronted" the requested quantity of cocaine. (Tr. 199). At trial, Agent Doolittle described this process as follows:

> She [Armijo] detailed how every time that she had brought the cocaine out here to Henry County, she received from Anthony and at the 800 block of Tecumseh. * * * [S]he told us that she get it [the drugs] on the front, so on the front means that you don't pay for it up front so, um, your source gives you the drugs and then you sell it and then you use that money then to repay your source and you keep your profits.

(Tr. 137). Armijo affirmed that she was "trusted" enough to take these drugs from the enterprise without paying up front with the understanding that she would return with the funds that she owed the enterprise after the sale. (Tr. 258).

**{¶33}** After the sale, Armijo returned from Henry County to Lucas County with the funds she received from her buyer. She then paid the enterprise for the drugs that had been "fronted" to her. (Tr. 199). *See State v. Nelms*, 5th Dist. Delaware No. 13 CAA 07 0055, 2014-Ohio-3316, ¶ 9; *State v. Sandoval*, 9th Dist. Lorain No. 95CA006150, 1996 WL 107002, *5 (Mar. 13, 1996) (concluding that "receiving payment for the goods" was "participat[ion] in their sale" for purposes of venue).

**{¶34}** In the process described by Agent Doolittle, Armijo was essentially earning money for the enterprise through this sale in Henry County. *See State v. Kruse*, 6th Dist. Wood No. WD-05-001, 2006-Ohio-3179, ¶ 22. By fronting to

Armijo, the enterprise came to have a direct interest in the proceeds from the drugs sold to the buyer in Napoleon and was, therefore, invested in the outcome of the transaction in Henry County. Through this arrangement, the corrupt activity of the Tecumseh Street Gang reached into Henry County. *See State v. Mielke*, 12th Dist. Warren No. CA2012-08-079, 2013-Ohio-1612, ¶ 22 (holding that venue was proper "where the tentacles of the criminal enterprise touched"); *State v. Yates*, 5th Dist. Licking No. 2009 CA 00529, 2009-Ohio-6622, ¶ 62 (finding venue was proper because the enterprise's activities extended into the county where the trial was held).

**{¶35}** In conclusion, "a prosecution for engaging in a pattern of corrupt activity is properly venued in any county in which a portion of the corrupt activity occurred." *Haddix*, *supra*, at *8. At trial, the State produced some evidence establishing that Brown was part of an enterprise and that a portion of that enterprise's corrupt activities reached into Henry County. Based on the identified evidence, a reasonable trier of fact could conclude that venue was proper in Henry County. Accordingly, the first assignment of error is overruled.

### *Second Assignment of Error*

**{¶36}** Brown argues that a finding of venue in Henry County is against the manifest weight of the evidence.

### Standard of Review

**{¶37}** The manifest-weight-of-the-evidence analysis examines whether the State has carried its burden of persuasion at trial. *State v. Wilson*, 2022-Ohio-504,

185 N.E.3d 176, ¶ 58 (3d Dist.). A manifest-weight challenge asserts that the verdict is not supported by the greater amount of credible evidence. *State v. Harvey*, 3d Dist. Marion No. 9-19-34, 2020-Ohio-329, ¶ 12.

> On appeal, courts "must review the entire record, weigh the evidence and all of the reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the factfinder 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"

*State v. Randle*, 2018-Ohio-207, 104 N.E.3d 202, ¶ 36 (3d Dist.), quoting *Plott*, *supra*, at ¶ 73, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541 (1997).

**{¶38}** "A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses." *State v. Sullivan*, 2017-Ohio-8937, 102 N.E.3d 86, ¶ 38 (3d Dist.), quoting *State v. Coleman*, 3d Dist. Allen No. 1-13-53, 2014-Ohio-5320, ¶ 7. "Only in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Little*, 2016-Ohio-8398, 78 N.E.3d 323, ¶ 27 (3d Dist.), quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119.

Legal Standard

**{¶39}** We reincorporate the standard for venue in cases where a defendant is charged with engaging in a pattern of corrupt activity as set forth above.

Legal Analysis

{¶40} Brown makes several arguments to establish that the finding of venue in this case is against the manifest weight of the evidence. First, Brown argues that Armijo's testimony only establishes that she sold illegal drugs independently of the enterprise. At trial, Armijo testified that she purchased cocaine from Anthony and sold them to customers. After obtaining these illegal drugs, she would then determine what she needed to distribute to her customers and cut the cocaine with baking soda to obtain this desired amount. On several occasions, she sold these drugs in Henry County and retained the profits from these sales.

{¶41} Armijo testified that she did not obtain directives from the enterprise on cutting the drugs; the prices she charged; or the customers with whom she did business. She further stated that her objective was to make money for herself; that she kept her profits; and that she did not work for Anthony or Brown. Armijo also testified that she had not interacted with Brown during her transactions at Tecumseh Street.

{¶42} While this testimony establishes that not all of the drug sales she engaged in were conducted on behalf of the enterprise, the State still established that Armijo was fronted the illegal drugs she sold in Henry County on at least one occasion. By fronting this cocaine, the enterprise became interested in the outcome of this transaction and in the profits generated by this sale. Through this arrangement, the enterprise drew Armijo into their operation and reached into Henry

County with its pattern of corrupt activity. The existence of the other transactions mentioned by Armijo does not negate this fact and does not render the finding of venue as being against the manifest weight of the evidence.

**{¶43}** Second, Brown argues that the testimony of Michael Nelson ("Nelson") does not establish venue because he only purchased illegal drugs in Lucas County for his personal use. At trial, Nelson testified that he regularly bought cocaine from the enterprise in Toledo and travelled back to Henry County where he lived with these drugs. No evidence establishes that he sold these drugs on behalf of the enterprise after he entered Henry County. While a finder of fact could not conclude venue was proper on this evidence alone, Nelson's testimony does not render the finding of venue on the other evidence in this case as being against the manifest weight of the evidence.

**{¶44}** Third, Brown argues that the texts between him and Jessica Carroll ("Carroll") do not establish venue because these communications indicated only that she travelled through Henry County. Carroll was found in possession of contraband during a traffic stop in Henry County after having travelled to the 800 block of Tecumseh Street in Toledo, Ohio. Again, a finder of fact could not conclude that venue was proper from this evidence alone, but these texts do not render the finding of venue on the other evidence in the case as being against the manifest weight of the evidence.

**{¶45}** Having reviewed the evidence presented at trial on the basis of its weight and credibility, we conclude that the record does not contain any indication that the jury lost its way in determining that venue was proper in this case. Thus, Brown's arguments have failed to establish that his conviction is against the manifest weight of the evidence. Accordingly, the second assignment of error is overruled.

*Conclusion*

**{¶46}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of Henry County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**WALDICK and ZIMMERMAN, J.J., concur.**

**/hls**